### 1558

Arnold SIMMONS, Appellant v. Rose Mary ROBINSON, Personal Representative of the Estate of Ellen D. Anderson, and South Carolina Department of Social Services, of whom South Carolina Department of Social Services is Respondent.

(399 S.E. (2d) 605)

Court of Appeals

*Kathy D. Lindsay* and *Phillip L. Fairbanks*, both of *Graber, Baldwin, Fairbanks & Lindsay*, Beaufort, *for appellant.*

*K. Lindsay Terrell*, of *Howell, Gibson & Hughes*, Beaufort, *for respondent.*

Heard April 17, 1990.

Decided Oct. 22, 1991.

SANDERS, Chief Judge:

This action for a declaratory judgment arises out of an accident in which a child was injured while riding as a passenger in a car being driven by his foster mother. The action was brought on behalf of appellant Arnold Simmons, the child, against Rose Mary Robinson, Personal Representative of the estate of Ellen D. Anderson, the foster mother, and respondent South Carolina Department of Social Services. A declaration is sought on the question of whether Mrs. Anderson was covered under a certain liability insurance policy issued to DSS by the Insurance Reserve Fund. The trial judge ruled she was not covered. We reverse and remand.

Like Blanche DuBois, Arnold has depended on the kindness of strangers.[1] He became a ward of the State when he was placed, by order of the Family Court, in the custody of DSS. Sometime thereafter, DSS placed him in the home of Mrs. Anderson, a foster mother. A great tragedy ensued.

On or about July 6, 1985, Mrs. Anderson was traveling in her car to visit her relatives. Arnold was riding with her as a passenger. Her car collided with a culvert. She was killed, and he was terribly injured.

Suit was brought on behalf of Arnold against the estate of Mrs. Anderson and DSS, alleging she was negligent and reckless in the operation of her car and that, at the time of the accident, she was "an employee/agent of DSS."

At the time, the doctrine of soverign immunity barred tort claims against a governmental defendant except to the extent the defendant had liability insurance coverage. *See* S.C. Code Ann. § 15-78-20(c) (Supp. 1989); *Taylor v. Murphy*, 293 S.C. 316, 360 S.E. (2d) 314 (1987). DSS answered, denying liability

---

[1] *See* T. Williams, *A Streetcar Named Desire* 165 (1947) (Blanche: "Whoever you are—I have always depended on the kindness of strangers.").

on the ground that it had no liability insurance coverage because Mrs. Anderson "was not a covered individual under the policy of automobile liability insurance in effect at the time the cause of action arose."

The liability insurance policy in question covers DSS "and its employees." Employees are covered while operating a privately owned vehicle "provided such operation is in the performance of, in connection with, or incidental to their duties."

A second suit was then brought on behalf of Arnold, seeking a declaratory judgment as to whether Mrs. Anderson was covered under the liability insurance policy. Because of the substantial medical expenses incurred by Arnold and the relatively low limits of coverage provided by the policy, counsel agreed that the coverage question should be resolved before the case is tried on its merits.

Thus, two issues were presented to the trial judge: (1) whether, at the time of the accident, Mrs. Anderson was an employee of DSS within the meaning of the policy; and (2) whether she had been operating her vehicle "in the performance of, in connection with, or incidental to [her] duties."

The trial judge found that "the policy was issued in light of the South Carolina Governmental Motor Vehicle Tort Claims Act." The Act provided: "The word *'employee'* shall mean and include any officer, employee or agent of the State. . . ." S.C. Code Ann. § 15-77-220(3) (1976) (repealed 1986). Therefore, the trial judge ruled, in effect, that the policy covered not only employees, but agents as well. His ruling in this regard is not disputed.

The trial judge concluded, however, that Mrs. Anderson, as a foster parent, had not been an employee of DSS, even under the expanded definition provided by the Act. He further concluded that, even if Mrs. Anderson had been an employee, her operation of her car was not "in the performance of, in connection with or incidental to her duties." Although his order is exceptionally well written, we are constrained to reach opposite conclusions on both issues.

## I.

The primary issue, and the issue the trial judge determined was dispositive, is whether the relationship between DSS and a foster parent is that of employer and

employee or whether, on the other hand, a foster parent is an independent contractor. "The words 'employer' and 'employee' are the outgrowth of the old terms 'master' and 'servant'; they have been adopted by reason of the shift of the relation in general from a personal to an impersonal one, and are the terms now commonly used to describe the relationship." 53 Am. Jur. (2d) *Master and Servant* § 1 at 81 (1970).[2] Therefore, while the term employee has different meanings according to the context in which it is used, the relationship of employer and employee is the same as that of master and servant, and for the purposes of the instant case, the terms servant and employee mean the same thing. The term independent contractor, on the other hand, has always been used to designate an entirely different relationship. *Id.* at § 4.

"The decisive test in determining whether the relation of master and servant [or employer and employee] exists is whether the purported master [or employer] has the right or power to direct and control the servant [or employee] in the performance of [the] work and in the manner in which the work is to be done." *Felts v. Richland County*, 299 S.C. 214, 217, 383 S.E. (2d) 261, 263 (Ct. App. 1989). There is scant evidence that DSS actually exercised control over Mrs. Anderson, but there is abundant evidence that the agency had the right and authority to control and direct foster parents, including Mrs. Anderson, in the performance of their work and in the manner in which the work is to be done. Numerous examples are found in DSS regulations as well as a manual promulgated by the agency and entitled *Policy and Procedure Manual*.

DSS issues or denies a license to foster parents based on a review and assessment of the foster family home. 27 S.C. Code Ann., Regs. 114-5-50(C)(3) (Supp. 1989). A license may be revoked "if the foster family fails to maintain proper stan-

---

[2] Many Americans do not like the term "servant." *Kourik v. English*, 340 Mo. 367, 100 S.W. (2d) 901 (1936). The term was originally applied to menials or domestics, but it is by no means limited to persons performing this kind of work or, indeed, any particular kind of work. Rather, it has long been recognized that all persons who are employed to serve under the direction and control of other persons may properly be referred to as "servants." *Burgess v. Carpenter*, 2 S.C. 7 (1870). Of course, they may also be referred to by the more egalitarian term "employee."

dards of care and services to children." 7-A South Carolina Department of Social Services, *Policy and Procedure Manual* § 09.21.75 (1981). The foster home must meet location, fire, hazard, health and sanitary standards required by DSS. S.C. Regs. 114-5-50(I)(1)(a)-(d). Foster parents are required to notify DSS of any significant change in the foster home. *Id.* at (L)(5). Household members must submit medical reports to DSS. *Id.* at (I)(1)(e). Foster parents working outside the home must submit a total care plan, and any individuals who are to provide child care on their behalf must first be interviewed by DSS staff. *Id.* at (F)(1), (2). A child cannot be left without competent supervision. *Id.* at (J)(16). Foster parents must get the permission of DSS to have an unrelated lodger or boarder in the foster home. *Id.* at (L)(6). Foster parents must have a minimum of ten hours pre-service training prior to being licensed and another five hours annually prior to being relicensed, all of which is provided or approved by DSS. *Id.* at (I)(1)(h).

Within five working days of placement, DSS gives foster parents detailed information concerning the child and the plans DSS has for the child. *Policy and Procedure Manual* § 09.22.64. DSS requires foster parents to plan a daily routine for the child and to provide the child with adequate health aids and a varied, wholesome and adequate daily diet. S.C. Regs. 114-5-50(J)(1), (2), (10). Foster parents are required to provide religious education "in accordance with the expressed wishes of the natural parents." *Id.* at (J)(12). DSS requires foster parents to make available varied recreational activities and to keep "a life book/scrapbook on [the] child." *Id.* at (J)(17). DSS imposes numerous and detailed restrictions with respect to the sleeping arrangements for the child. *E.g., id.* at (J)(7) ("The top level of bunk beds shall not be used for pre-school children."). Foster parents must obtain permission from DSS to take the child on out-of-state trips of more than seven working days. *Policy and Procedure Manual* § 09.23.35. DSS must be given notice of trips of shorter duration, and biological parents must be advised of plans for trips. *Id.*

Foster parents must obtain permission from DSS for the child to obtain a driver's license. *Id.* at § 09.23.34. DSS specifies the discipline which foster parents are allowed to adminis-

ter. S.C. Regs. 114-5-50(J)(13). They are prohibited from assigning tasks to the child except those "appropriate to the ability of the child, similar to responsibilities assigned to other children, and geared toward teaching personal responsibility." *Id.* at (J)(14). DSS requires that "[s]pace for a child's possessions shall be provided." *Id.* at (J)(3). Foster parents are required to follow the instructions and suggestions of health care providers, to immediately obtain needed emergency medical treatment for the child, and to notify DSS of any such treatment within one working day.. *Id.* at (J)(8)(9). DSS reserves the right to require foster parents to cooperate in assuring that the child is able to maintain regular contact with the biological parents. *Id.* at (E)(4)(c).

Perhaps even more significant than everything we have already pointed out is the fact that DSS expressly reserves the right to supervise foster parents. The *Policy and Procedure Manual* requires that a DSS worker must regularly visit the child. *Policy and Procedure Manual* § 08.24.20. These visits are explicitly termed "On-going Supervisory Visits." The Manual requires the DSS worker to provide, or arrange for another DSS worker to provide, "support and supervision." *Id.* at § 08.24. Moreover, the Manual refers to DSS as having "supervision responsibility." *Id.* at 08.24.20.

Our Supreme Court "has recognized four factors bearing on the crucial right of control." *Chavis v. Watkins*, 256 S.C. 30, 32, 180 S.E. (2d) 648, 649 (1971). "These are (1) direct evidence of the right to or exercise of control, (2) method of payment, (3) furnishing of equipment, and (4) right to fire." *Crim v. Decorator's Supply*, 291 S.C. 193, 194, 352 S.E. (2d) 520, 521 (Ct. App. 1987) (quoting *Chavis*, 256 S.C. at 32, 180 S.E. (2d) at 649). In view of the overwhelming direct evidence of the right of DSS to control foster parents, it is not really necessary to consider the other three factors. However, a consideration of these factors yields no different conclusion. The second factor, the method of payment, is not helpful one way or the other. Foster parents are paid a monthly stipend. The DSS regulations refer to these payments as "board payments." S.C. Regs. 114-5-50(A)(2). They are not paid an hourly wage, like some employees, but neither are they paid a lump sum for their services, like some independent contractors. Nor is the third factor, the furnishing of equipment, helpful. Unlike such work as

the construction of roads or bridges, or the erection of buildings, the various aspects of child care are not normally thought of as requiring "equipment." The fourth factor, the right to fire, is consistent with the right of DSS to control foster parents. As we have said, DSS has the right to revoke licenses issued to foster parents. *Policy and Procedure Manual* § 09.21.75; S.C. Regs. 114-5-50(N)(5). DSS also has the right to remove a child from foster parents. *Policy and Procedure Manual* § 09.23.30(5), (17). It is true that foster parents have available to them a grievance procedure through which they can challenge a termination or a removal. *Id.* at § 09.23.31. But, the existence of this procedure does not mean that foster parents are not employees. After all, almost all State employees have a grievance procedure available to them. *See* S.C. Code Ann. § 8-17-310 to -380 (1986, Supp. 1989) ("State Employee Grievance Procedure Act of 1982").

As previously pointed out, an independent contractor is entirely different from a servant or an employee. 53 Am. Jur. (2d) *Master and Servant* § 4. "An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods, without being subject to the control of his employer except as to the result of his work." *Chavis*, 256 S.C. at 32, 180 S.E. (2d) at 649. One performing work for another is not an independent contractor "when the [master or] employer reserves control and an interest in the performance of the work other than the finished product." *Young v. Warr*, 252 S.C. 179, 190, 165 S.E. (2d) 797, 802 (1969). By no means does DSS say to foster parents, "Here is a child. Give us an adult." Rather, it is clear that the agency reserves an interest in how the work of foster parents is performed, not merely an interest in the finished product.

The trial judge, of course, took a different view of the matter. He pointed out that "DSS did not control the life in the Anderson home on a day to day basis." In his own inimitable fashion, he recited a litany of decisions made by Mrs. Anderson:

> [She] decided on hamburgers or hotdogs, on Home Box Office or Disney, on taking a bath in the morning or in the evening, on whether a wool or cotton sweater was needed, on whether to go on a picnic or to a ball game, on whether a given word could be used in polite conversa-

tion or not, whether to take a child on a visit to see Mrs. Anderson's relatives or not, etc.

(Although we reverse the result reached by the trial judge, we must confess we admire his eloquence.) The problem with his analysis is that it focuses on the control actually exercised by DSS, whereas the proper test is whether DSS had the right and authority to control Mrs. Anderson. *Felts*, 299 S.C. 214, 383 S.E. (2d) 261. Doubtless, he is correct that DSS did not actually make the decisions listed, but it is clear that DSS had the right and authority to direct and control Mrs. Anderson in making decisions for the child. The *Policy and Procedure Manual* allows foster parents to have a say in the decisions of the agency, but the Manual expressly provides: "The final decision, however, regarding plans for the child must be decided by the [a]gency." *Policy and Procedue Manual* § 09.23.30(9).

For these reasons, we conclude that Mrs. Anderson was an employee, not an independent contractor.[3]

---

[3] We are aware that courts in three other states have held that foster parents are not employees. *New Jersey Property-Liability Ins. Guar. Ass'n. v. State,* 195 N.J. Super. 4, 477 A. (2d) 826 (App. Div. 1984); *Blanca C. v. County of Nassau,* 103 A.D. (2d) 524, 480 N.Y.S. (2d) 747 (1984), *aff'd,* 65 N.Y. (2d) 712, 492 N.Y.S. (2d) 5, 481 N.E. (2d) 545 (1985); *Kern v. Steele County,* 322 N.W. (2d) 187 (Minn. 1982). We choose not to follow these decisions for several reasons.

In the first place, *New Jersey Property* and *Kern* may very well be distinguishable on their facts. It does not appear from the opinions that the governmental agencies in those states have the right to exercise the same degree of control as DSS. For example, unlike DSS, it does not appear that they have explicit "supervision responsibility." Moreover, we cannot subscribe to the analysis engaged in by the two Courts. In *New Jersey Property,* the Court considered whether foster parents furnish "equipment." As previously discussed, we do not think this is a realistic consideration. Similarly, the Court in *Kern* considered whether foster parents furnish "materials or tools." We do not think this is a realistic consideration either. The things used to provide child care are many and varied, everything from bassinets and pabulum plates to bunk beds and book bags. If all these things are to be thought of as tools, then parents will certainly need enormous toolboxes.

The decision in *Blanca* appears to be based exclusively on what the Court called "policy considerations." The opinion does not even address the crucial question of whether the governmental agency had the right to control foster parents. Among the principal reasons given by the Court for its decision was "the danger that judicial imposition of vicarious liability might prompt the County to restrict or abolish its foster care program in favor of institutional placement." 103 A.D. (2d) at 532, 480 N.Y.S. (2d) at 752. Assuming, without

## II.

We further conclude that Mrs. Anderson's operation of her car, at the time of the accident, was at least incidental to her duties as a foster parent. The insurance policy issued to DSS does not require that an employee be operating his or her vehicle in the performance of employment duties or even in connection with those duties. It is sufficient if the employee's operation of the vehicle is merely incidental to the duties. The job of being a parent, any kind of a parent, including a foster parent, is seldom a sometime thing. This is a matter of common sense, well known to everyone who has enjoyed the sometimes mixed blessing of being a parent. More importantly, the use Mrs. Anderson was making of her car, traveling with Arnold to visit her relatives, is encouraged by the official policy of DSS. *See Policy and Procedure Manual* §§ 09.23.30(11) (foster parents "[h]ave the right to continue their own family patterns and tradition"), 09.23.35 ("It is hoped that foster children will be able to participate in all activities of their foster family—including the family's vacation.").[4]

In ruling that Mrs. Anderson's operation of her car was not even incidental to her duties, the trial judge conjured up what he termed "the fabled doctrine of unthinkability." He apparently felt that to rule otherwise would make DSS liable for virtually any accident caused by the negligent operation of a car by a foster parent. In his view, such a result would be unthinkable. Once again, he wrote eloquently:

> Since the plaintiff was a member of the household, any household errand that the car was used for, to get groceries, to take the cat to the veterinarian, or to get gas for the car would result in vicarious liability to DSS if an accident occurred through the driver's negligence. Even

---

deciding, that this is a proper consideration, in our opinion, an equally sound argument can be made that a decision not to hold the governmental agency liable might also jeopardize the foster care program. It seems to us, people might be reluctant to become foster parents if they are told that only they, and not the governmental agency who employed them, will have to defend against allegations they were negligent. They might be even more reluctant if they knew they would have to provide all their own insurance because the insurance policy issued to the governmental agency provided them no coverage.

[4] *See* R. Burns, "Extempore in the Court of Session," reprinted in *The Complete Works of Robert Burns* 197 (1865) ("[W]hat his common sense came short, / He eked out [with] law. . . .").

a trip to the liquor store might result in vicarious liability due to the driver's negligence, since liquor might help the [foster parents] relax and be more understanding parents.

Once again, his analysis, although eloquently stated, is logically flawed. Not every use of a car by foster parents is necessarily incidental to their duties. Nor is such a conclusion necessary to the result we reach in this case. Rather, each case must be decided on its own facts. We simply hold that, at the time of the accident, the particular use Mrs. Anderson was making of her car, traveling with Arnold to visit her relatives, was incidental to her duties as a foster parent. In any event, even if the so-called doctrine of unthinkability exists, it does not apply here. Quite obviously, the result we reach cannot be unthinkable: we have thought it.[5]

## III.

In addition to the foregoing, there are two other, completely different and perhaps better, reasons for concluding that there is coverage under the insurance policy issued to DSS.

### A.

As the trial judge correctly ruled, the policy covers not only employees but agents as well. Agency is a comprehensive term, having more than one meaning. In its broadest sense, it includes "every relation in which one person acts for or represents another." *Doane Agricultural Service v. Coleman*, 254 F. (2d) 40, 43 (6th Cir. 1958), *cert. denied*, 358 U.S. 818, 79 S. Ct. 29, 3 L. Ed. (2d) 60 (1958). Under this definition, "[a]n independent contractor can also be an agent; the two are not mutually exclusive." *State ex rel.*

---

[5] As far as we know, it was the trial judge in this case who first discovered the doctrine of unthinkability. At the very least, it was he who elevated the concept to the status of a doctrine. There is, however, substantial precedent for the concept. For example, in an opinion authored by Chief Justice Warren, the United States Supreme Court ordered the integration of the public schools of Washington, D.C., saying simply that to rule otherwise would be "unthinkable." *Bolling v. Sharpe*, 347 U.S. 497, 500, 74 S. Ct. 693, 695, 98 L. Ed. 884 (1954). Therefore, the trial judge may be on sound ground in recognizing the doctrine. Then, again, he may not be.

*McLeod v. C&L Corp., Inc.*, 280 S.C. 519, 526, 313 S.E. (2d) 334, 338 (Ct. App. 1984). The term agency is, of course, used in a more restricted sense in the law of principal and agent. *See Restatement (Second) of Agency* § 1(1) (1958) (defining agency). But in the instant case, we are required to define the term broadly. *See McCracken v. Government Employees Ins. Co.*, 284 S.C. 66, 325 S.E. (2d) 62 (1985) (the terms of an insurance policy must be construed liberally). Foster parents, like Mrs. Anderson, act for and represent DSS. A second manual promulgated by DSS specifically recognizes that "[w]hen a child is placed in foster care voluntarily or through a Court Order, it is the responsibility of the Department of Social Services to protect that child and to provide for her needs. The agency fulfills its duties through a foster care arrangement." South Carolina Department of Social Services, *Manual For Foster Parents.*

For these reasons, we conclude that, even if Mrs. Anderson was an independent contractor, she was nevertheless an agent of DSS within the meaning of the insurance policy issued to the agency, and therefore, she was covered under the policy.

### B.

The Family Court entrusted custody of the child to DSS, not Mrs. Anderson. As the agency correctly states in its Manual, "the Department is legally responsible for the child." *Id.* Some responsibilities are so important to society that they cannot be transferred. W. Keeton, D. Dobbs, R. Keeton and D. Owen, *Prosser and Keeton on Torts* § 71 (5th ed. 1984). A person who delegates to an independent contractor an absolute duty owed to another person or to the public remains liable for the negligence of the independent contractor just as if the independent contractor were an employee. 57 C.J.S. *Master and Servant* § 591 (1948).

Our Supreme Court has implicitly recognized these principles. *E.g., Wesley v. Holly Hill Lumber Co.*, 211 S.C. 40, 43 S.E. (2d) 619 (1947) (the duty of an employer to provide an employee with a safe workplace is a nondelegable duty); *Jenkins v. E.L. Long Motor Lines, Inc.*, 233 S.C. 87, 103 S.E. (2d) 523 (1958) (the duty of a common carrier to the traveling public to assure proper distribution of cargo on a trailer is a nondelegable duty). In both these cases, the person

who delegated the nondelegable duty to another was held liable for the negligence of the other. *Cf. Bellamy v. Hardee*, 242 S.C. 71, 78, 129 S.E. (2d) 905, 909 (1963) ("[T]he duty of the master to furnish the servant a reasonably safe place to work and reasonably safe and suitable tools and appliances is ordinarily a nondelegable duty. . . ."); *Jackson v. Powe*, 241 S.C. 35, 39, 126 S.E. (2d) 841, 842-43 (1962) ("The general rule is that the master is under a nondelegable duty to his servant to afford him with reasonably safe instrumentalities with which to work and a safe place in which to work. . . .").

Similarly, our Supreme Court has held that the duty of a municipality to provide safe streets is a fundamental responsibility and, even though maintenance of the streets is undertaken by the Highway Department, the municipality remains liable for defects. *E.g., Dolan v. City of Camden*, 233 S.C. 1, 103 S.E. (2d) 328 (1958).

It cannot be seriously argued that either the duty to provide a safe workplace or the duty to assure proper distribution of cargo on a trailer is more important to society than the duty to care for a child. Nor can it be seriously argued that the duty of a government to provide safe streets is more important than the duty of a governmental agency to provide proper care for children in its custody. *Cf. Pickett v. Washington County*, 31 Or. App. 1263, 1268, 572 P. (2d) 1070, 1073 (1977) ("A more important or altruistic government function [than caring for children] is difficult to imagine.").

The Louisiana Supreme Court has addressed the specific question of whether a state agency, comparable to DSS, is liable for acts of foster parents. *Vonner v. State Dep't of Public Welfare*, 273 So. (2d) 252 (La. 1973); *see also Cathey v. Bernard*, 467 So. (2d) 9 (La. App. 1985) (construing the decision of the Court in *Vonner*). We find this case persuasive. The Court held that, "[w]hen [a state agency] obtains or accepts the custody of children, it becomes directly responsible for their care and well-being." *Vonner*, 273 So. (2d) at 255. The Court further held that the agency "cannot insulate itself from this responsibility by contracting it out to others to fulfill." *Id.* Thus, the Court concluded that the agency "is vicariously liable for the acts of the foster parents." *Id.* In refusing to allow the agency to avoid liability by means of a delegation, the Louisiana Supreme Court observed: "The children of our state

are its most precious resource." *Id.* at 256. Surely, no less may be said of the children of South Carolina.

For these additional reasons, we conclude that, even if Mrs. Anderson was an independent contractor, DSS is nevertheless liable for her negligence just as if she had been an employee, and therefore, there is coverage under the insurance policy.

Accordingly, the declaratory judgment in favor of South Carolina Department of Social Services is reversed, and the case is remanded with direction that, consistent with this decision, judgment be entered for the child, Arnold Simmons.

Reversed and remanded.

GARDNER and CURETON, JJ., concur.