**DISTRICT OF COLUMBIA, Appellant,**

v.

**Debra Ali HAMPTON, Appellee.**

**No. 90–CV–1148.**

District of Columbia Court of Appeals.

Argued March 24, 1992.

Decided Sept. 29, 1995.

As Amended Dec. 4, 1995.

Edward E. Schwab, Assistant Corporation Counsel, with whom John Payton, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellant.

H. Vincent McKnight, Jr., with whom Karl N. Marshall, Washington, DC, was on the brief, for appellee.

Before FERREN, TERRY, and KING, Associate Judges.

TERRY, Associate Judge:

In this negligence case the District of Columbia appeals from the denial of its motion for judgment notwithstanding the verdict. Appellee, Debra Ali Hampton, is the mother of Mykeeda Hampton, a two-year-old girl who died while in the care of her foster mother, Geraldine Stevenson. In August 1987 Mrs. Stevenson left Mykeeda at home with her two sons, aged fifteen and twelve, for over ten hours while she ran several errands, and during that time Mykeeda was beaten to death by the twelve-year-old. Appellee brought this suit against the District of Columbia and Mrs. Stevenson raising several claims: that Mrs. Stevenson was negligent in leaving Mykeeda with the two boys; that Mrs. Stevenson was the District's agent, so that the District was liable for her negligent acts under the doctrine of *respondeat superior*; that the District of Columbia Department of Human Services (DHS) was negligent in selecting Mrs. Stevenson to be Mykeeda's foster mother; and that DHS was negligent in monitoring Mykeeda's care after she had been placed in Mrs. Stevenson's home. The jury returned a verdict in Mrs. Hampton's favor. The District filed a motion seeking a judgment notwithstanding the verdict, a new trial, or a remittitur, all of which the trial court denied.

On appeal the District makes two assignments of error. First, it contends that Mrs. Hampton was required to introduce expert testimony to prove the standard of care applicable to social workers involved in foster care, and that without such testimony the jury could not have found the District negligent in placing and monitoring Mykeeda. Second, the District maintains that it cannot be held liable for Mrs. Stevenson's negligence on a theory of *respondeat superior* because she was not its agent. We hold that the conduct of the DHS social worker responsible for monitoring Mykeeda's foster care was not self-evidently negligent, and hence that expert testimony on the applicable standard of care was required. Since none was presented, and since we also hold that the evidence failed to show that Mrs. Stevenson was the agent of the District of Columbia, we reverse the judgment of the trial court.[1]

I

In the fall of 1985 Geraldine Stevenson decided that she would like to be a foster parent. At that time she was divorced and had four sons living with her, ranging in age from ten to seventeen. In October she began attending DHS's training and orientation program for foster parents,[2] and when that was completed, she filed an application to become a foster parent. A DHS social worker completed an investigation of Mrs. Stevenson in May 1986 which included several visits to her home, a check of her references and her employment, interviews with the four boys, and an evaluation of Mrs. Stevenson's day care plan for potential foster children. The social worker noted in her report that Mrs. Stevenson planned to use a next-door neighbor, Virgie Davis, as a babysitter while she was at work.[3] The social worker found "no evident areas of concern" and recom-

---

1. The District does not challenge the trial court's denial of its alternative request for a remittitur.

2. The program consisted of eight one-hour sessions dealing with such topics as the operation of the foster care system and the impact of foster care on a host family.

3. Mrs. Stevenson admitted that at that time Ms. Davis' home was not licensed by DHS for day care of foster children. Davis herself testified, however, that she became licensed to care for foster children in her home in May 1987.

mended that two children be placed in Mrs. Stevenson's home.

In May 1986 Mrs. Stevenson signed a contract with DHS to be a foster parent[4] and was given a list stating the "basic requirements" necessary to maintain a foster home.[5] A two-week-old girl named Amber was placed in Mrs. Stevenson's home in May 1986 and remained there until Mykeeda's death in August 1987. At various times between May 1986 and May 1987 five other children were placed in the Stevenson home for periods ranging from a few days up to six months. After Mrs. Stevenson's oldest son moved away in the latter part of 1986, she was authorized to care for as many as four foster children at a time.

In May 1987 DHS removed four of Debra Hampton's children from her home and obtained court orders for their placement in foster homes. The four children were twin girls aged four, two-year-old Mykeeda, and a boy less than one year old. According to the testimony of a DHS social worker, the children were removed because Mrs. Hampton had left them alone and was not properly supervising them; in addition, her home was "generally uninhabitable" and on occasion contained no edible food.[6] The twins were immediately placed with Geraldine Stevenson. After staying briefly in the home of her paternal grandparents, Mykeeda Hampton was placed in another foster home.

Between May and August 1987 Mrs. Stevenson brought the Hampton twins to the DHS office every week so that they could visit with their mother, their sister Mykeeda, and their brother. At some time during that period, DHS officials told Mrs. Stevenson that they wanted to place Mykeeda with her because they wanted to reunite the girl with her sisters and because her foster parent was unable to keep her. Mrs. Stevenson testified that she objected to Mykeeda's being placed with her "from the beginning" because during the family visits at DHS she had seen that Mykeeda would not talk to anyone, was not toilet-trained, and "would walk around with her head to the floor ... [and] looked sad all the time." According to Mrs. Stevenson, a DHS official told her that because she had a "vacancy" in her home, she had to take Mykeeda.

On August 4, 1987, Mykeeda was placed in Mrs. Stevenson's home. Mrs. Stevenson testified that on the day Mykeeda was brought to her, she told Mykeeda's social worker that the girl "was too much [for] me." Stevenson also acknowledged that while Mykeeda was in her care, there were two occasions on which the child was spanked. In the first incident Mrs. Stevenson herself spanked Mykeeda, leaving "a red bruise because she was an easy bruiser." Then, about a week or two later, Mrs. Stevenson's twelve-year-old son hit Mykeeda on the rear end with a wooden toy, breaking the skin. Mrs. Stevenson reported both incidents to the DHS social worker.

Mrs. Stevenson admitted in her testimony that she occasionally left Mykeeda and the other foster children at home under the supervision of her two eldest sons, who were seventeen and fifteen years old, while she went on errands which sometimes lasted as long as three hours. Although Mrs. Stevenson never told the DHS social worker about this practice, the social worker quickly realized what was going on when she would call Mrs. Stevenson's home and one of the sons would answer. On August 25, the day after

---

4. The "Basic Agreement for Board and Care by Foster Parents of Wards of the District of Columbia" states in part:
   The Foster Parents agree to provide board and care including provision of food, shelter, laundry service, supervision and suitable training of wards of the District.... The District agrees to assist the Foster Parents in the care and training of the wards, by visits and advice from service workers of the Social Rehabilitation Administration.

5. The list sets forth minimum requirements in twenty-one areas, including such items as clean-

liness of the foster home, sleeping arrangements for the foster children, heat and hot water, toilet and bath facilities, smoke detectors, medical treatment of the foster children, and the health of the foster parent. It also states that foster parents "must agree to accept any child referred for placement."

6. Mrs. Hampton's husband had recently died, and she was experiencing considerable emotional stress as a result of his death, apparently to a degree that she was unable to care properly for her children.

Mykeeda's death, the social worker wrote in her case report that she was aware that Mrs. Stevenson sometimes left the foster children at home without adult supervision.[7] When asked about this report at trial, the social worker testified that there had been one instance in which she telephoned the Stevenson house, and the young man who answered the phone told her that Geraldine Stevenson was not at home.

On August 24 Mrs. Stevenson went out at 7:30 a.m. to have some work done on her car. She left the four foster children (the twin girls, Mykeeda, and Amber) in the care of her fifteen-year-old and twelve-year-old sons. Mrs. Stevenson did not return home until 5:30 in the evening, but during the day she made several telephone calls to her home to check on the children and was told that everything was fine.

At about 4:30 p.m., Robin Shorts, Mrs. Stevenson's sister-in-law, came to the Stevenson apartment. She found Mrs. Stevenson's twelve-year-old son, Marcus,[8] and three of the foster children (Amber and the twins) watching television. She went to Mykeeda's bedroom and saw her on the bed, apparently asleep. A few minutes later she sent the twelve-year-old to Mykeeda's bedroom to wake her up. When he returned with the girl in his arms, Shorts saw that Mykeeda was "limp . . . just lying there" and did not appear to be breathing. Shorts immediately called for an ambulance and attempted to administer CPR, but Mykeeda could not be revived. By the time Mrs.

Stevenson got back to the apartment at 5:30, an ambulance, police, and a television news crew had arrived. Mykeeda died at about 6:00 p.m.[9] The other three foster children were removed from Mrs. Stevenson's home that evening, and her foster care license was taken away.

Mrs. Hampton filed suit against the District of Columbia and Geraldine Stevenson seeking compensatory and punitive damages under the survival statute, D.C.Code § 12–101 (1989).[10] The District filed two motions for summary judgment, but they were both denied. The case then went to trial before a jury. After all the evidence was in, the District moved for a directed verdict. The court granted the motion in part, but only on the limited issue of whether the District had been negligent in training Geraldine Stevenson; as to all other issues the motion was denied. After the jury returned its verdict,[11] the District moved for judgment n.o.v., a new trial, or a remittitur. The court denied the motion, and the District noted this appeal.

The case was submitted to the jury on three alternative theories of liability: (1) that the District, through DHS, had negligently selected Mrs. Stevenson as a foster mother for Mykeeda, (2) that the District, through DHS, had been negligent in its monitoring and supervision of Mrs. Stevenson's performance of her duties as a foster mother, and (3) that the District was liable under principles of *respondeat superior* for Mrs. Stevenson's negligence because she was its agent. Since any one of these three theories, if sustained on appeal, would support the ver-

7. Another DHS social worker, who had conducted the foster care training sessions for Geraldine Stevenson, testified that Mrs. Stevenson had been told that one requirement of foster care was to provide twenty-four hour adult supervision of foster children.

8. Shorts testified that earlier that day she had left her son Marcus next door with Virgie Davis. Some time later one of Mrs. Stevenson's sons went to Davis' apartment, picked up Marcus, and brought him back to the Stevenson apartment. Marcus remained there until his mother arrived.

9. An autopsy later established that Mykeeda died of blunt force injuries to the head, abdomen, and back, with internal hemorrhaging. The twelve-year-old admitted that he had struck her several times because he was angry at having been left

with the responsibility of caring for four small children. He was later found guilty of involuntary manslaughter in a juvenile delinquency proceeding.

10. A second claim under the wrongful death statute, D.C.Code § 16–2701 (1989), was withdrawn before trial.

11. The jury made special findings that the District had been "negligent in selecting Mrs. Stevenson as Mykeeda's foster mother" and "negligent in supervising Mrs. Stevenson's foster care of Mykeeda," and found as well that Mrs. Stevenson had been "the District of Columbia's agent in providing foster care for Mykeeda." The jury awarded Mrs. Hampton $500,000 in damages "for Mykeeda's conscious pain and suffering and other injuries. . . ."

dict, we must address all three in considering the District's arguments. Because the first two have as a common element the District's direct negligence (if any) in selecting and supervising a foster parent, we take them up together in part II of this opinion; then in part III we discuss whether the District is vicariously liable for Mrs. Stevenson's negligence.

## II

To establish a standard of care for the placement and monitoring of children in foster care, Mrs. Hampton sought to call a witness with a Ph.D. in developmental psychology to testify as an expert on "the provision of day care service in the foster care scenario." Counsel for the District raised an objection, however, and after a hearing outside the presence of the jury, the court declined to accept the witness as an expert.[12] No other expert testimony was offered. In its motion for judgment n.o.v., the District argued that Mrs. Hampton was required to present expert testimony to establish the standard of care applicable to the selection and supervision of a foster parent. The court rejected this argument, holding that no expert testimony was needed because the jury "was fully capable of deciding for itself without an expert witness" whether the District had been negligent in selecting Mrs. Stevenson as a foster parent and in supervising her in the performance of her duties. The District now contends that this ruling was error.

■ The plaintiff in a negligence action bears the burden of proving "the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984) (citations omitted). Furthermore, "if the subject in question is so distinctly related to some science, profession, or occupation as to be beyond the ken of the average

layperson," expert testimony is usually required to prove the standard of care. *District of Columbia v. Peters,* 527 A.2d 1269, 1273 (D.C.1987). There is, however, a partial exception to this rule which we have characterized as "the 'common knowledge' exception to the expert testimony requirement." *O'Neil v. Bergan,* 452 A.2d 337, 342 (D.C. 1982). We summarized that exception in *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195 (D.C.1991):

> Where negligent conduct is alleged in a context which is within the realm of common knowledge and everyday experience, the plaintiff is not required to adduce expert testimony either to establish the applicable standard of care or to prove that the defendant failed to adhere to it.

*Id.* at 200 (citations omitted). The issue before us is whether the instant case is controlled by this exception or whether it falls under the general rule requiring expert testimony to prove the applicable standard of care.

■ The general rule is most commonly applied, or at least its application is at issue, in professional malpractice cases. *E.g., Eibl v. Kogan,* 494 A.2d 640, 642–643 (D.C.1985) (medical malpractice); *Meek v. Shepard, supra,* 484 A.2d at 581 (medical malpractice); *O'Neil v. Bergan, supra,* 452 A.2d at 341 (legal malpractice); *see Bell v. Jones,* 523 A.2d 982, 988–990 (D.C.1986) (summarizing evidence establishing standard of care for surveyors). Over the last decade or so, however, the requirement has been applied more broadly in a variety of situations. *E.g., Messina v. District of Columbia,* 663 A.2d 535, 538 (D.C.1995) (expert testimony necessary to prove standard of care for construction of safe playground equipment); *Beard v. Goodyear Tire & Rubber Co., supra,* 587 A.2d at 200 (expert testimony necessary "to identify the appropriate standard of care to which retail merchants should be held in

12. This proffered witness was rejected by the court because she lacked sufficient experience with municipal foster care programs and had no relevant knowledge of the standards promulgated by the Child Welfare League, which are widely accepted in the field. The court concluded that the witness could not aid the jury in determining

the applicable standard of care and refused to allow her to testify. On appeal Mrs. Hampton does not challenge this ruling; instead, she argues (as she did below in opposing the District's post-trial motion) that expert testimony was not necessary to establish the standard of care.

processing applications for credit cards"); *District of Columbia v. Carmichael*, 577 A.2d 312, 314 (D.C.1990) (expert testimony necessary to prove standard of care for protecting prison inmates from injury by other prisoners); *Hughes v. District of Columbia*, 425 A.2d 1299, 1303 (D.C.1981) (same); *see Lenkin–N Limited Partnership v. Nace*, 568 A.2d 474, 477 (D.C.1990) (testimony by "experts in commercial office construction" necessary to determine whether delay in completing construction of office space in commercial building was reasonable); *District of Columbia v. Freeman*, 477 A.2d 713, 719 (D.C.1984) (expert testimony necessary to determine "whether a painted crosswalk is sufficient to render a particular intersection reasonably safe"). The common thread running through all of these cases, and many others, is that expert testimony is needed if "the subject matter is too technical for the lay juror...." *Beard, supra*, 587 A.2d at 200; *see Harris v. Cafritz Memorial Hospital*, 364 A.2d 135, 137 (D.C.1976) (in medical malpractice action, test is whether the case "involves the merits and performance of scientific treatment, complex medical procedures, or the exercise of professional skill and judgment"), *cert. denied*, 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977).

In the substantially smaller number of cases falling within the common knowledge exception, we have refused to require expert testimony when the issue before the jury did not involve either a subject too technical for lay jurors to understand or the exercise of sophisticated professional judgment. For example, in *Washington Hospital Center v. Martin*, 454 A.2d 306 (D.C.1982), a 93–year-old patient fell out of her hospital bed and broke her hip. She sued the hospital, alleging "that it had been negligent in leaving her unattended and in failing to protect her from falling out of bed." *Id.* at 307. We affirmed a judgment in favor of the patient, holding

that no expert testimony was needed to establish the pertinent standard of care:

> The issue in this case was not whether the doctor correctly prescribed restraints for [the patient] or whether the nursing staff applied them properly. Those are matters which generally involve professional judgment and skill, and if the exercise of such judgment and skill is at issue, expert testimony would no doubt be needed in an appropriate case. Here, however, the issues before the jury were whether [the patient] was in fact under restraints immediately prior to her fall and, if not, whether the hospital was negligent in leaving her unattended.

*Id.* at 308. We agreed with the trial court "that these were not questions on which expert testimony was either necessary or helpful." *Id.*[13] Similarly, in *Hamilton v. Needham*, 519 A.2d 172 (D.C.1986), we held that expert testimony was not necessary to prove the standard of care, when the evidence showed that an attorney drafting a will had omitted a residuary clause requested by the testator, thereby causing the residuary estate to pass by intestate succession contrary to the testator's wishes. We held that this evidence "facially demonstrated an obvious lack of care and skill" and that "[n]o expert need guide the factfinder here." *Id.* at 175.

■ Although this case does not fit neatly into any of the categories of cases in which this court has required expert testimony, we conclude that the District is correct in arguing that the selection of foster parents and the supervision of the care they provide are not activities "within the realm of common knowledge and everyday experience...." *Matthews v. District of Columbia*, 387 A.2d 731, 735 (D.C.1978). Consequently, expert testimony was needed to establish the standard of care before the District could be found liable for either negligent selection or

---

13. In so holding, we relied on *Washington Hospital Center v. Butler*, 127 U.S.App.D.C. 379, 384 F.2d 331 (1967), in which a hospital patient was injured when she fell from an x-ray table as it was rotated to a vertical position during an examination. In *Butler* the court held that expert testimony was not required to show that the hospital was negligent, drawing "a distinction between cases in which the issue involves 'the

merits and the performance of scientific treatment,' requiring expert testimony for its resolution, and 'ordinary' negligence cases, in which jurors may apply their own experience in deciding how any reasonably prudent person would have acted under the circumstances." *Martin, supra*, 454 A.2d at 309 (citations and footnote omitted).

negligent supervision of a foster parent. As the District points out in its brief, social work is a licensed profession in the District of Columbia, the practice of which is limited to persons with specialized training. *See* D.C.Code § 2–3305.1 (1994).[14] It is regulated by a five-member Board of Social Work, four of whose members must be licensed social workers. D.C.Code § 2–3302.12. Under the statutory scheme, social workers are considered "health professionals" along with doctors, dentists, nurses, optometrists, pharmacists, and nursing home administrators, among others, all of whom must be licensed. D.C.Code § 2–3305.1. In the foster care context, the decisions that social workers must make when placing children with foster parents are clearly beyond "the everyday experiences of a lay person." *Hughes v. District of Columbia, supra,* 425 A.2d at 1303. They must assess the particular physical and emotional needs of each child, the availability of vacancies in licensed foster homes, and the past performance of each foster parent. These are not matters that a jury of lay persons can reasonably be expected to know about.

■ Mrs. Hampton suggests that the DHS social workers were on notice of potentially serious problems in the Stevenson household, and that their failure to intervene amounted to actionable negligence. They knew, for example, that on one occasion Mrs. Stevenson's twelve-year-old son had struck Mykeeda with a wooden toy so hard as to break the skin. We do not think that this one incident would permit a jury to find that DHS had a duty to withdraw Mykeeda from the Stevenson home, especially when there was no evidence that Mrs. Stevenson herself was unable to keep the situation under control by supervising her son more closely. There was also another time when Mrs. Stevenson left Mykeeda and her three other foster children under the supervision of her teenaged sons, contrary to the express requirements of DHS governing the children's placement. As far as the record shows, however, these incidents were not frequent,[15] and Mrs. Stevenson was absent for a relatively short period of time, three hours at most. Nor is it commonly accepted that leaving a two-year-old in the care of a fifteen-year-old, without more, is negligent conduct. DHS was not on notice that Mrs. Stevenson was likely to leave the foster children with her own children for as long as ten hours, as she did on August 24. These incidents, in our view, do not establish as a matter of "common knowledge and everyday experience," *Matthews, supra,* 387 A.2d at 735, that DHS was negligent in failing to remove Mykeeda from Mrs. Stevenson's care; hence they do not vitiate the need for Mrs. Hampton to prove the relevant standard of care by expert testimony. Without such testimony, a reasonable juror could not have found that the social workers' failure to intervene after learning of these events demonstrated a "lack of care and skill ... so obvious that the trier of fact [could] find negligence as a matter of common knowledge." *O'Neil v. Bergan, supra,* 452 A.2d at 341 (citations omitted).

■ We hold, therefore, that Mrs. Hampton should have presented expert testimony on the standard of care, and that the absence of such testimony was fatal to her case. "If the standard itself is not proven, then a deviation from that standard is incapable of proof." *District of Columbia v. Carmichael, supra,* 577 A.2d at 314. Without sufficient proof of the standard of care, her claims of negligent selection and negligent supervision should never have gone to the jury. *Messina v. District of Columbia, supra,* 663 A.2d at 540; *Meek v. Shepard, supra,* 484 A.2d at 582.

### III

■ The District also maintains that Geraldine Stevenson was not its agent but an

14. Although the record does not reveal whether the social workers in this case were licensed, it does show that both of the DHS social workers who testified had master's degrees in social work. Moreover, under the statute, only licensed persons may practice the profession of social work in the District of Columbia.

15. Although Mrs. Stevenson admitted that she occasionally left the foster children with her two eldest sons, the DHS social worker testified only about one such incident, when she telephoned the Stevenson home and was told that Mrs. Stevenson was not there.

independent contractor, and thus that any negligence on her part cannot be imputed to it under the doctrine of *respondeat superior.* The trial court ruled that there was a jury issue as to whether Mrs. Stevenson was the District's agent and instructed the jury accordingly. The District argues, however, that an essential element of an agency relationship—the principal's right to control the agent—was missing in the instant case because there was no evidence that the District had the right to exercise control over the day-to-day care that Mrs. Stevenson, as a foster parent, provided to her foster children.[16] On the record as a whole, we agree with the District that Mrs. Hampton failed to prove this critical element, and that the District was therefore entitled to judgment on the question of its vicarious liability for Mrs. Stevenson's negligent conduct.

As it relates to foster care, this is an issue of first impression for this court, and one that has not been addressed by many other courts. The trend of recent case law, however, seems to be that foster parents are not deemed to be agents or employees of state family service agencies. *See Kern v. Steele County,* 322 N.W.2d 187 (Minn.1982) (evidence insufficient to prove that state social workers had a right to control the manner in which foster home operated; state agency's right to remove foster child at will is not conclusive of employer-employee relationship); *New Jersey Property Liability Insurance Guaranty Ass'n v. State,* 195 N.J.Super. 4, 477 A.2d 826 (1984) (evidence insufficient to prove that state agency had a right to control foster parents); *Blanca C. v. County of Nassau,* 103 A.D.2d 524, 532, 480 N.Y.S.2d 747, 752 (1984) (court refused to impose vicarious liability upon the county for acts of foster parents because it would "inflict [a] potentially crushing financial burden ... on the public fisc"), *aff'd,* 65 N.Y.2d 712, 481 N.E.2d 545, 492 N.Y.S.2d 5 (1985); *Simmons*

*v. Robinson,* 305 S.C. 428, 409 S.E.2d 381 (1991) (foster parent is a licensee of state social services agency, not an employee or an independent contractor).[17] The Supreme Court of Louisiana in one case did impute liability to a state agency for the negligence of a foster parent, but on the ground that when the state public welfare agency removes a child from its natural parents, "the ultimate duty of care [for the child] is nondelegable and remains [the state's] legal responsibility." *Vonner v. State Dep't of Public Welfare,* 273 So.2d 252, 256 (La.1973). Since the duty was not delegable, the court found it unnecessary to decide whether the foster parent was an agent of the state or an independent contractor. *Id.* at 256 n. 3.

■ Whether a master-servant (or principal-agent) relationship exists in a given situation "depends on the particular facts of each case." *Safeway Stores, Inc. v. Kelly,* 448 A.2d 856, 860 (D.C.1982); *accord, e.g., McGinniss v. Frederick W. Berens Sales, Inc.,* 308 A.2d 765, 766 (D.C.1973). The person asserting the relationship—in this case, Mrs. Hampton—has the burden of proof. *Henderson v. Charles E. Smith Management, Inc.,* 567 A.2d 59, 62 (D.C.1989); *Smith v. Jenkins,* 452 A.2d 333, 335 (D.C. 1982). This court has recognized several factors to be considered in determining whether such a relationship exists:

> (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer.

*LeGrand v. Insurance Co. of North America,* 241 A.2d 734, 735 (D.C.1968) (citation and internal quotation marks omitted). We have often held, however, that of these five factors "the determinative factor" is usually the fourth: "the right to control an employee in

---

16. To prevail on a *respondeat superior* theory of liability, the plaintiff must show that a principal-agent relationship existed and that the agent's negligent act occurred within the scope of the relationship. *Giles v. Shell Oil Corp.,* 487 A.2d 610, 611 (D.C.1985). The District does not dispute that Mrs. Stevenson's allegedly negligent actions were within the scope of her duties as a foster parent.

17. The state supreme court in *Simmons* reversed the decision of the state court of appeals in *Simmons v. Robinson,* 303 S.C. 201, 399 S.E.2d 605 (S.C.Ct.App.1990), which held that a foster parent was an agent of the state's Department of Social Services.

the performance of a task and in its result, and not the actual exercise of control or supervision." *Safeway Stores, supra,* 448 A.2d at 860 (citations omitted); *accord, e.g., Levy v. Currier,* 587 A.2d 205, 209 n. 10 (D.C.1991) ("[t]he right to control the [alleged agent], not only as to the final result but in the performance of the task itself, is the most important factor in determining whether someone is a servant or an independent contractor" (citation omitted)); *Henderson, supra,* 567 A.2d at 62 (court "must look for evidence that the activities of the agent are subject to the principal's *control*" (emphasis in original)); *Giles v. Shell Oil Corp., supra* note 16, 487 A.2d at 611 (determination of agency relationship "basically turns on one of these factors: control").

In analyzing the employer's right to control, this court has generally looked to the actual relationship between the parties and, if a written agreement existed between them, to the language of that agreement. For instance, in *Safeway Stores, supra,* there was evidence of several instances in which Safeway management gave instructions to store security guards, who in turn complied with those instructions. We said that "specific instances of actual control are evidence of the general right of Safeway to control [the security guard] in the performance of his duties." 448 A.2d at 861. In *Giles v. Shell Oil, supra* note 16, the court found nothing in "the parties' actual relationship" to indicate that Shell had "the right to control the day-to-day operation of the [gas] station or the day-to-day performance of its employees." 487 A.2d at 613. In *Rose v. Silver,* 394 A.2d 1368, 1372 (D.C.1978), the court held that actions by a Connecticut corporation (seeking out an attorney and directing him to set up an office in the District of Columbia) showed that the attorney was the corporation's agent. Finally, in *Henderson, supra,* we looked to the actual "dealings between the parties, as reflected in the record," 567 A.2d at 64, in order to determine whether they demonstrated "the crucial element of right to control...." *Id.* at 65. The language of any written contract between the parties may also be significant in determining the right to control. *See Henderson, supra,* 567 A.2d at

62–63; *Giles, supra* note 16, 487 A.2d at 612–613.

■ In this case there was very little testimony about the actual relationship between Mrs. Stevenson and the DHS social workers, and none suggesting that the District had a right to control Stevenson's daily performance of her foster care duties. The testimony of Maria Clark, the DHS social worker assigned to supervise Mykeeda's foster care, did not establish that Mrs. Stevenson took direction from Clark in caring for Mykeeda. For example, on one occasion Stevenson telephoned Clark and said that Mykeeda had developed bruises from being spanked by Stevenson and her son, and from using a plastic potty trainer. Clark testified that she did not go to the Stevenson home to check on Mykeeda, but assumed that Mykeeda "simply ... bruised easily." Mrs. Hampton offered no evidence that Clark or any other DHS representative counseled Mrs. Stevenson about taking care of Mykeeda once she had been placed in the Stevenson home. In fact, as the District points out, Mrs. Stevenson testified that she controlled many areas of her foster children's lives and that she was responsible for making *all* the day-to-day decisions about their care: what they would eat, what clothes they would wear, when they needed new clothes, when they would bathe, where they would spend their time, and how they would be disciplined. Without any evidence that DHS actually controlled the manner in which Mrs. Stevenson cared for Mykeeda, no reasonable juror could have found that Mrs. Stevenson was the District's agent.

■ Mrs. Hampton argues that the many rules and regulations concerning foster homes demonstrate that the District reserved the right to control a foster parent. The list of "basic requirements" for a foster home, see note 5, *supra,* implicitly gives the District the right to control such matters as the sleeping arrangements for a foster child, the temperature of the foster home, the diet of the foster child, and certain aspects of the foster parents' health. The District also reserves the right to inspect a foster home at

any time.[18] There are rules pertaining to the health care of a foster child,[19] and a foster parent must obtain permission from DHS before taking a foster child on an out-of-town trip. Finally, the District has the right to remove a foster child from the foster home at any time and without prior notice.[20]

These regulations obviously show that the District has the authority to dictate many aspects of a foster child's life in a foster home. But that does not establish that the foster parent is under the *actual* control of the District to a degree sufficient to make him or her the District's agent. To paraphrase what we said in *Giles v. Shell Oil,* *supra* note 16, "the right to inspect" and "the right to set standards by which [a foster parent performs her duties] are not indicia of control. They in no way indicate that [the District] had the right to control the day-to-day operation of the [foster home] or the day-to-day performance of [the foster parent]." 487 A.2d at 613. If the District did not have the right to control the daily activities of caring for the foster child, then even this plethora of regulations cannot be said to have created a principal-agent relationship between the District and Mrs. Stevenson.

■ Mrs. Hampton also asserts that the contract which Mrs. Stevenson signed with DHS to become a foster parent "illustrates the authority and right of [DHS] to control the foster parent's actions." The language of the contract does not support this proposition. This "basic agreement" states, in relevant part, that the foster parent agrees "to provide board and care including ... supervision and suitable training of wards of the District," and that the foster parent "will render [these] services ... in the same manner as if [foster] children were members of the family" of the foster parent. For its part, the District "agrees to assist the foster parent in the care and training of wards, by visits and advice from [DHS] service workers...." This language clearly leaves it to the foster parent to make the day-to-day decisions necessary to care for a foster child, just as any parent would do for her own children.

The provisions outlining the District's duties do not reflect an intent on the District's part to reserve any right to control the care of foster children. The District agrees only to "assist" and "advise" the foster parent, not to direct her daily conduct. The discussion in the *New Jersey Property Liability* case, *supra,* is instructive on the proper meaning to be given to these terms. In that case the court examined several statutes related to foster care, one of which required foster parents to "consult" with a social worker from the Division of Youth and Family Services (DYFS) "before making important decisions." 195 N.J.Super. at 13, 477 A.2d at 831. Another required DYFS to "assist the foster parents in carrying out their responsibility toward the child by giving them information regarding the child's needs...." *Id.* (internal punctuation omitted). The court concluded that although DYFS had "authority to direct the result to be accomplished—providing foster children with a normal, wholesome home life—it [did] not retain control over the means by which this was to be done." *Id.*[21] The words used in the statutes—"assist" and "consult"—"clearly reflect the diminished control DYFS exercised over the [foster parents] regarding

---

18. Other regulations pertain to such aspects of "physical set-up" as the spacing of beds in a room, "provision for outdoor play," lighting and ventilation, screens on windows, "furnishings and equipment suitable to the age of the children cared for," and "adequate supply of linen and bedding." The regulations also state that "[t]he meals served should meet the basic nutritional needs of the children. Only wholesome foods should be served...."

19. DHS provides free medical services for foster children, but foster parents must obtain the consent of DHS before any surgery or administration of anesthesia.

20. The Foster Parents' Handbook and other documents setting forth these rules and regulations were admitted into evidence at trial.

21. The court also noted that the agency's right to control medical treatment and travel by the foster child outside of the county was not indicative of a right to control: "the consent requirements here vest DYFS with only negligible control over the way the [foster parents] structure and carry out the work [of] caring for the foster child." 195 N.J.Super. at 14, 477 A.2d at 832.

the means (as compared with the ends) of foster care." *Id.* (citation omitted). Likewise in the instant case, the terms "assist" and "advise" in Mrs. Stevenson's contract reflected the District's limited right "to direct the result to be accomplished—providing [Mykeeda] with a normal, wholesome home life," but not to control "the means by which this was to be done."

For these reasons we hold that the evidence was insufficient to prove that Mrs. Stevenson was the District's agent, and that the trial court therefore erred in allowing Mrs. Hampton's *respondeat superior* claim to go to the jury.

### IV

The judgment of the trial court is accordingly reversed, and this case is remanded with directions to grant the District's motion for judgment notwithstanding the verdict.

*Reversed and remanded.*