**Gary S. HENDERSON, and Eunice Foreman, Appellants,**

v.

**CHARLES E. SMITH MANAGEMENT, INC., Appellee.**

No. 87–1114.

District of Columbia Court of Appeals.

Argued Nov. 10, 1988.
Decided Dec. 8, 1989.

---

Leonard P. Buscemi, with whom Edward J. Connor, Landover, Md., and Steven L. Willner, Suitland, Md., were on the brief, for appellants.

Steven M. Levine, Washington, D.C., with whom Walter J. Smith was on the brief, for appellee.

Before NEWMAN, BELSON and SCHWELB, Associate Judges.

NEWMAN, Associate Judge:

Appellants, both maintenance workers at the Brandywine Apartments, owned by the Brandywine Company (Brandywine), were severely injured[1] when a valve dislodged from a boiler, causing scalding water and steam to spew out of the boiler and onto Appellants. Appellants brought suit against the Charles E. Smith Management Company (CES), alleging negligence in the maintenance and repair of the boiler. CES was under contract with Brandywine to perform certain rental, leasing, and management functions at the apartment building. The trial court determined that CES acted as an agent for Brandywine, and, thus, that it was immune from suit pursuant to the workers's compensation laws of the District of Columbia, D.C.Code § 36–304(b) (1981); accordingly, it entered summary judgment for CES. Because a material question of fact exists as to whether CES had the right to exercise such control regarding decisions about the maintenance and repair of the boiler so as to include CES within the definition of "agent" for the purposes of workers' com-

---

1. Clinton Foreman, who suffered burns over 80% of his body and died three weeks after the accident, is being represented by his personal representative, Eunice Foreman. Gary S. Henderson is left with permanent scarring.

pensation, it was error to grant summary judgment. We reverse.

## I.

On January 1, 1981, Brandywine entered into a five-year management agreement with CES (Management Agreement). This agreement designated CES as Brandywine's "exclusive Rental and Management Agent" and vested CES with authority over some matters concerning personnel, leasing, and management of the Brandywine Apartments, although this authority was not absolute.

At the time of the accident, the Brandywine Apartments were heated by two steam boilers that had been installed in 1953. Several individuals were involved in the inspection, supervision, and maintenance of these boilers. Walter Moore, the mechanical specialist, apparently ranked at the top of the boiler supervision team—which of CES or Brandywine was his employer, is disputed on the record. Moore supervised Byong Kim, the mechanical supervisor. Whether CES or Brandywine was Kim's employer is also disputed on the record. Kim was responsible for the daily inspection of the Brandywine boiler, as well as those at seven other buildings.[2]

On February 20, 1984, seven days before the accident, Kim, along with Elbert Faulk, the maintenance supervisor employed by Brandywine, found a leak in the boiler. Kim testified that he told Faulk not to take action until after he (Kim) had consulted with Walter Moore. Moore's exact instructions are unclear from the record, although he apparently instructed Kim that he and Faulk should fix the boiler. On February 27, 1984, the day of the accident, Kim told Faulk to add a new valve to the boiler. Upon completion of his job, Faulk ordered Henderson and Foreman to collect the old piping that lay on the floor of the boiler room. As they did so, the valve dislodged, permitting scalding water and steam to escape and injure them.

The trial judge ruled that "it was unequivocally clear" that an agency relationship had been created between CES and Brandywine, and consequently granted CES's motion for summary judgment. We disagree.[3]

## II.

■ The Workers' Compensation statute of the District of Columbia imposes liability on employers for job-related injury or death, D.C.Code § 36–303 (1988), and constitutes the exclusive remedy against the employer for job-related injuries. D.C. Code § 36–304(a) (1988); *see Grillo v. Natl. Bank of Washington*, 540 A.2d 743, 747 n. 11 (D.C.1988). The statute provides further that agents of such employers are immune from suit:

> The compensation to which an employee is entitled under this chapter shall constitute the employee's exclusive remedy against the employer or ... *any employee, officer, director, or agent of such employer* ... for any illness or injury, or death arising out of and in the course of his employment.

D.C.Code § 36–304(b) (1988) (emphasis added).

■ CES argues that it functioned as Brandywine's agent pursuant to the general terms of the Management Agreement and that the grant of summary judgment was proper. Henderson et al. focus on the narrower issue of the maintenance and repair of the boiler. They assert that Brandywine did not exercise the degree of actual control over CES in decisions regarding the boilers to make CES an "agent" within the meaning of D.C.Code § 36–304(b). Thus, they contend that CES is indepen-

---

**2.** The District of Columbia requires that pressure boilers be inspected by a Class 3 licensed engineer. D.C.Code § 2–2401 (1988 Repl.).

**3.** This court's standard of review is the same as that of the trial court when it initially considers a motion for summary judgment. *Holland v. Hannan*, 456 A.2d 807, 814 (D.C.1983); *Wyman v. Roesner*, 439 A.2d 516, 519 (D.C.1981). This court must conduct an independent review of the record, *Holland, supra*, 456 A.2d at 814, and will find for the moving party as a matter of law only when "no genuine issue of material fact is present at the time the motion is made." *Murphy v. Army Distaff Found., Inc.*, 458 A.2d 61, 62 (D.C.1983). *See* Super.Ct.Civ.R. 56(c) (1989).

dently liable for injuries arising from any breach in the standard of care in their repair and maintenance.[4] We disagree with the contention of Henderson et al., that the relevant inquiry for us is whether Brandywine *exercised* actual control over CES in decisions regarding the repair of the boiler. Rather, our inquiry must focus on whether Brandywine had the *right* to exercise such control. We hold that whether Brandywine had the right to exercise control over decisions regarding the repair and maintenance of the boiler is a disputed and material fact, and, thus, the agency issue was resolved improperly by summary judgment.

▬ The existence of an agency relationship is a question of fact, for which the person asserting the relationship has the burden of proof. *Smith v. Jenkins,* 452 A.2d 333, 335 (D.C.1982). "Generally, an agency relationship results when one person authorizes another to act on his [or her] behalf subject to his [or her] control, and the other consents to do so." *Id.* (citing *Rose v. Silver,* 394 A.2d 1368, 1371 (D.C.1978). Stated differently, to determine whether a principal-agent relationship has been created, the court must analyze the relationship between the parties in its entirety and determine if two factors exist. First, the court must look for evidence of the parties' *consent* to establish a principal-agent relationship. Second, the court must look for evidence that the activities of the agent are subject to the principal's *control.* *Johnson v. Bechtel Assocs. Professional Corp.,* 230 U.S.App.D.C. 297, 717 F.2d 574, 580 (D.C.Cir.1983), *aff'g* 545 F.Supp. 783 (D.D.C.1982), *cert. granted,* 464 U.S. 1068, 104 S.Ct. 972, 79 L.Ed.2d 210, *rev'd sub nom. on other grounds, Washington Metr. Area Transit Auth. v. Johnson,* 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768

(1984); *see Smith, supra,* 452 A.2d at 335; *Rose, supra,* 394 A.2d at 1371. We have held the *control* factor to mean the principal's *power* or *right* to control the actions of the agent,[5] as opposed to the actual exercise of that power. Of course, as the court in *Bechtel* stated, the extent to which the dual factors of control and consent exist "is evidenced both by the terms of the contract and by the actual dealings between the parties." *Bechtel, supra* 717 F.2d at 579. The situation presented in *Bechtel* is similar to the case now before us, and we find its analysis instructive.

## A. Terms of the contract

In *Bechtel,* the Washington Area Metropolitan Transit Authority (WMATA) contracted with Bechtel to administer the safety program on its subway construction project. WMATA was subject to Section 80 of the WMATA Compact, which provided that WMATA "shall be liable for its contracts and for its torts and those of its Directors, officers, employees, and agent." *Id.* at 577. The court in *Bechtel* had to determine whether Bechtel operated as an agent of WMATA. The court scrutinized the terms of the contract and found that "[t]aken as a whole, the contract provides that Bechtel shall act on behalf of and subject to the authority of WMATA." *Id.* at 579. (emphasis added). To support this conclusion, the court determined that the consent factor needed for a principal-agent relationship was implicit in those terms of the contract granting Bechtel "authority to conduct operations for and in the name of WMATA." *Id.* As to the control factor, the court found persuasive those portions of the contract granting WMATA extensive oversight power over Bechtel in project operations, personnel, and safety aspects of the WMATA project. Of special

---

**4.** Specifically, appellants argue that CES breached its standard of care by (1) failing to provide qualified personnel to perform the inspection, maintenance, and repairs on the boiler; (2) failing to cool down the boiler sufficiently before performing repairs; (3) failing to inspect and replace the entire connection, rather than merely adding a new valve; and (4) failing to follow proper procedures for installing the part which was added to the boiler system.

**5.** *Rose v. Silver, supra* 394 A.2d at 1371. *See also Bechtel, supra* 545 F.Supp. at 785 ("while the principal's right to control is essential, the degree of control exercised need not be great."); *Metro Casualty Ins. Co. v. Hoage of N.Y.,* 63 U.S.App.D.C. 307, 308, 72 F.2d 175, 176 (1934); *Natl. City Dev. Co. v. Fadeley,* 148 A.2d 306, 307–08 (D.C.1959).

importance to the court was the portion of the contract providing for a contracting officer, a full-time WMATA employee with pervasive supervisory control over Bechtel's actions.[6]

Unlike the WMATA–Bechtel contract, the terms of the Management Agreement between Brandywine and CES are much less clear as to whether Brandywine had the right to exercise control over CES's actions. Both parties concede that the Management Agreement evidences consent to enter into a principal-agent relationship. Indeed, similar to the WMATA–Bechtel contract, the Brandywine–CES contract provided that "[e]verything done by the Agent under [the] terms of this Agreement shall be done as Agent of the Owner." But, although the Brandywine–CES contract authorizes CES to "act in the name and at the expense of the owner" regarding various operations,[7] unlike the WMA-TA–BECHTEL contract, the Brandywine–CES contract does not condition these actions upon Brandywine's approval, supervision, direction, or control. For example, the Management Agreement does not require CES to keep Brandywine informed of its operations, except for emergency and non-budgeted repairs in excess of $5,000.[8] Moreover, there is no requirement that CES report unsafe conditions to the owner, that CES's activities be directed or evaluated by Brandywine, or that Brandywine be informed of CES's activities. Significantly, unlike the contract in *Bechtel*, the Management Agreement does not give any official of Brandywine supervisory power over the activities of CES.

Thus, the language of the contract by itself does not tell us whether Brandywine retained a right of control over what CES did in its name,[9] and specifically, whether

6. For example, the contracting officer was to be "kept fully informed of all operations under this contract," was to approve all of Bechtel's opera-tions, and was in charge of the "general supervision, direction, control and approval" of "the extent and character of the work" done by Bechtel. Furthermore, all personnel hired by Bechtel for WMATA and decisions regarding their salaries required WMATA approval. Finally, the contract provided that the contracting officer was to have primary responsibility for overseeing the safety aspects of the project, and a WMATA safety engineer was to oversee and direct the activities of the Bechtel safety department. *See Bechtel, supra,* 717 F.2d at 579.

7. For example:
Paragraph 6, Operation of Property:
The Agent is authorized, in the name and at the expense of the Owner to make contracts and to pay bills for all operating expenses as Agent may reasonably deem necessary or advisable, including but not limited to: electricity, gas, fuel, telephone and other utilities, janitorial services, equipment maintenance, vermin extermination, trash collection, and all other similar services.
Paragraph 7, Repairs and/or Alterations:
The Agent is authorized in the name and at the expense of the Owner, to make or cause to be made such ordinary repairs and/or alternations to the Property and to purchase such supplies and operating equipment as may be reasonably advisable or necessary.
Other examples include CES's authority to hire all on-site personnel "in the name of the Owner" (Management Agreement, para. 3(B)); to pay the payroll and payroll taxes out of the rents and other income received (Management Agreement, para. 8(A)(3)); and to prepare rental schedules and to collect rent (Management Agreement, para. 4).

8. Specifically, the agreement states: "All project repair items not including emergency repairs, and improvements not included in the approved budget, involving an expenditure in excess of $5,000, shall be submitted by the Agent to the Owners for prior approval before work is initiated by the Agent." (Management Agreement para. 8(A)(3)).

9. Although in most cases CES is authorized to act without obtaining prior approval or subsequent review by Brandywine, the contract expressly provides for Brandywine's prior approval regarding (1) the preparation and/or adjustment of a rental schedule (Management Agreement para. 4(A)), and (2) repairs exceeding $5000, (Management Agreement para. 8(A)(3)). This inconsistency regarding control may or may not reflect the intent of the parties to provide for an agency limited to certain matters.
We further note that Paragraph 11 calls for Brandywine to indemnify CES for "all claims, demands, damages, expenses, fines, penalties, suits, proceedings, actions and causes of action of any and every kind and nature arising or growing out of or in any way connected with the Agent's rental activities, management or control of the premises or the Agent's operations, conduct or activities at the building within the scope of the Agent's authority conferred by this Agreement which are not due to acts of negligence on the part of the Agent ..." This limitation on Brandywine's duty to indemnify

Brandywine retained a right of control concerning ordinary repairs to the boiler. A key question is raised as to what these parties intended regarding such operations.[10]

### B. *Actual Dealings Between Brandywine and CES*

The court in *Bechtel* found that the dealings between the parties, as evidenced by the actual day-to-day oversight by WMATA of Bechtel personnel on the construction site, reinforced the court's conclusion that an agency relationship existed. *Bechtel, supra,* 717 F.2d at 579–80. On the job site, a Bechtel employee, responsible for "ensuring that the various contractors compl[ied] with WMATA safety regulations, ... [*was*] *subject to the direction of the WMATA Contracting Officer from whom [the Bechtel employee] receive[d] both written and verbal instructions.*" *Id.* at 580 (emphasis added). As the court stated, although the Bechtel employee was "authorized to direct correction of safety violations, in practice he rarely [took] any major action without first consulting WMATA." *Id.*

 From the record before us, we cannot tell which entity had the right to exercise control, through its employees, over decisions regarding the Brandywine boilers. We are unpersuaded by CES's argument that the deposition of Harry Friedman, a general partner of Brandywine, who stated that CES performed all work as an agent for Brandywine, is determinative. Intent that an agency relationship exist, although relevant, is not dispositive, *Holt v. Winpisinger,* 258 U.S.App.D.C. 343, 811 F.2d 1532, 1538 (D.C.Cir.1987), nor is the manner in which the parties designate the controlling relationship. *See generally* 3 AM.JUR.2d *Agency* § 21 at 526–27 (1986).

Once again, the relevant inquiry for us in determining whether an agency relationship existed here is whether Brandywine had the *right* to control CES's actions with regard to routine, non-emergency boiler repairs. And once again, as is the case regarding the terms of the contract, we cannot tell from the dealings between the parties, as reflected in the record, whether that right existed.

The lack of clarity regarding the existence of a right of control over boiler repairs stems in part from confusion over the employment status of the persons involved in the repair and maintenance decisions regarding the Brandywine boilers. This issue was a subject of dispute below and here on appeal. Most of the discussion in the briefs and below focused on which company employed Byong Kim, the mechanical engineer responsible for the daily inspection of the Brandywine boiler. It was Kim who met with Walter Moore to discuss the valve leak and Kim who then relayed the directions to replace the valve to Brandywine employees Faulk and appellants, Henderson and Foreman. Both parties apparently agree that it was Kim who had ultimate control over decisions regarding the boiler; CES conceded in its pleadings in the trial court that if Kim were found to be an employee of CES, its motion for summary judgment would have to be denied.[11]

CES argues that Kim's affidavit, wherein he states that he was an employee of Brandywine, is dispositive. However, appellants point to evidence that suggests that Kim may have been a CES employee, including evidence that Kim was hired and rehired by CES in 1974 and 1981, that Kim testified under oath that he worked for one company for thirteen years, that he received a gasoline allowance and a pager from CES, and that he was the supervisor

---

may be viewed as further evidence of the intent of the parties to limit Brandywine's exposure by limiting its right of control.

**10.** Put another way, for example, would a CES employee whom CES brought from elsewhere into the Brandywine property to perform some minor repair be an employee of Brandywine for the purposes of Workers' Compensation?

**11.** We note that neither party emphasizes the employment status of Walter Moore, the individual with whom Kim claims to have discussed how the boiler should be repaired. The identity of Moore's employer might also be important to the resolution of this case, depending on the degree of control he exercised over Byong Kim. Internal Revenue Service Forms would aid in determining the identity of Moore's and Kim's employers.

of at least eight buildings under contract with CES. Appellants thus assert that Kim was a CES employee who had direct control over the activities of Faulk, Foreman and Henderson, all of whom were Brandywine employees.

Henderson et al. agree that the actual dealings between CES and Brandywine demonstrate that CES acted as an agent in some matters, such as leasing and finance, but not in other matters, such as mechanical maintenance and repairs, because the crucial element of right to control was demonstrated in the former areas and not in the latter. An entity, even though designated as an "agent," may "act as such in some matters but not in others." *In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir.1984) (citing *Patrick v. Miss New Mexico–USA Universe Pageant*, 490 F.Supp. 833, 939 (W.D.Tex.1980)); *see* 2A C.J.S. *Agency* § 12. at 574–75 (1972). Where the principal "has the right to control the agent's manner or method of achieving desired results," and does so, an agency relationship exists. *Patrick, supra,* 490 F.Supp. at 839. However, the fact that such a dual relationship may have existed does not end our analysis; the rele-

vant inquiry still remains: whether CES acted independently, through its own employees, concerning decisions regarding the boiler or whether they acted as an agent of Brandywine and under its control.

### III.

In light of the vagueness of the CES–Brandywine Management concerning repairs under $5000, a disputed issue of fact exists as to whether Brandywine had the right to exercise control over CES and its employees in decisions regarding the repair and maintenance of the boiler, and thus whether, with respect to the accident in this case, CES was an "agent" within the meaning of the statute. Therefore, the grant of summary judgment was improper.[12]

*Reversed.*

---

**12.** 1C A. Larson, The Law of Workmen's Compensation §§ 44, 45, 46 (1986) discusses two types of prevailing approaches to determine whether an entity serves as an employee or an independent contractor to the principal employer. The traditional approach analyzes the work relationship in terms of the right to control (as does this opinion). *See id.* at § 44.

The other approach, labeled the "relative nature of the work test," determines whether "the work being done is an integral part of the regular business of the employer, and when the worker, relative to the employer, does not furnish an independent business or professional service," the worker will be considered an employee and not an independent contractor. *Id.* § 45, at 8–174. As Larson remarks of this approach when discussing ancillary services such as maintenance:

"A sort of 'theory of relativity' ... becomes necessary. The independence of these artisans [referring to service workers such as 'window-washers, welders, well cleaners, ... carpenters, masons, boiler repairmen and repairmen of all kinds.'] is not to be determined by looking at the artisan or job alone, but by judging how independent, separate, and public his business service is in relation to a particular employer."

*Id.* § 45.31, at 8–215–16.

Given that which a court may know by judicial notice of CES as a real estate company involved in sales, leasing, management and the like, we think that summary judgment would likely have been inappropriate under this test as well.