**Allison Marie JUDAH, Appellant,**

v.

**Burton REINER and Morris Management, Inc., Appellees.**

No. 98–CV–92.

District of Columbia Court of Appeals.

Argued Jan. 14, 1999.

Decided Feb. 3, 2000.

Jonathan Zucker, with whom Patricia Daus and Alan L. Balaran, Washington, DC, were on the brief, for appellant.

Jack D. Lapidus, Washington, DC, with whom John C. Lynch was on the brief, for appellees.

Before TERRY and STEADMAN, Associate Judges, and KING, Senior Judge.

TERRY, Associate Judge.

This personal injury case began with the harassment of two young girls, appellant Allison Judah and her friend Tiara Dews, by two men with pit bull terriers.[1] The two girls sought refuge in the lobby of an apartment building, but were ordered to leave by a man claiming to be the resident manager. When the girls left the building, the men continued their assault, and Allison Judah was bitten by one of the dogs.

Ms. Judah filed suit against the owner of the building (Burton Reiner), the management company (Morris Management, Inc.), and the man who claimed to be the resident manager (initially identified as "John Doe"), alleging two counts of assault, one count of battery, and one count of negligence. In the first count, Judah claimed that the purported resident manager intentionally placed her in fear that he would inflict imminent bodily harm upon her if she did not leave the building. Counts two and three were based on the theory that the resident manager intentionally caused Judah to leave the building when he knew with substantial certainty that making her leave would cause her to fear that the men and the dogs would inflict imminent bodily harm upon her. In count four, Judah alleged that the resident manager breached his duty to refrain from evicting her when he reasonably should have known that making her leave would expose her to a substantial risk of serious bodily injury. Ms. Judah also maintained that Reiner and Morris Management ("Morris") were vicariously liable for the actions of the man who claimed to be the resident manager.

The trial court dismissed the second and third counts of Judah's complaint for failure to state a claim upon which relief could be granted, on the ground that the purported resident manager could not be held liable for assault and battery based on Judah's exposure to harm from the two men and their dogs. Following discovery, the court granted appellees' motion for summary judgment on the remaining assault count and the negligence count. Judah challenges both of these rulings on appeal. We hold that summary judgment in appellees' favor was warranted on all four counts, because Judah failed to proffer sufficient facts to establish the existence of an agency relationship and because she never named the man who actually evicted her as a defendant.

I

A. *Factual Background*

On the evening of February 19, 1996, while walking home after working on a

---

1. Allison Judah was twelve years old at the time of the incident; Tiara Dews was thirteen.

school project, Allison Judah and Tiara Dews encountered two men, each of whom had a pit bull terrier on a leash. The men began harassing the girls and pursued them for several blocks. Attempting to escape, the girls ran into the lobby of an apartment building at 1428 Euclid Street, N.W. One of the men followed the girls into the lobby, while the other remained outside. The resultant commotion drew the attention of a man living in the first apartment on the ground floor. This man, later identified as William Ragsdale, came out of his apartment and declared, "I am the manager. You are making too much noise. You have to get out." Judah and Dews informed him that they were being chased by two men with dogs and pleaded for his assistance. Ragsdale responded by raising his voice and stating, "You can leave from the front, you can leave from the back, but you have to get out."

After further protests were unavailing, Judah and Dews finally complied with his demand, leaving through a back door into an alley connected to the street. Almost immediately, they were intercepted by the two men, who used their pit bulls to corner the girls at the bottom of a stairwell. The men then ordered Judah and Dews to remove their clothing. When the girls refused, one of the men released his dog, ordering it to attack.[2] The dog bit Ms. Judah severely on the lower leg.[3] One of the two men then pried the animal's mouth open, and the girls managed to escape by climbing over a fence at the end of the alley. Judah was bitten again by one of the dogs, this time on the foot, as she was climbing the fence. Once over the fence, the girls ran to a nearby bus stop, where some Howard University students came to their aid and summoned an ambulance.

## B.  The Trial Court's Rulings

The trial court dismissed counts two and three of the complaint on the ground that Ms. Judah had failed to allege that William Ragsdale was the source of the apprehended harm. Later, after the completion of discovery, the court granted appellees' motion for summary judgment on the two remaining counts, ruling that Reiner and Morris could not be held vicariously liable for the acts of William Ragsdale. The court ruled that there was insufficient evidence of an employment relationship between Morris and William Ragsdale because there was "no evidence that Morris Management, Inc., recognized William as the resident manager, consented to William acting as the resident manager, or knew that he held himself out to be the resident manager." Additionally, the court held that even if an employment relationship existed, acting as a security guard or evicting trespassers was outside the scope of that employment.[4] Ms. Judah challenges all of these rulings on appeal.

## II

### A.  Respondeat Superior

In order to hold Reiner and Morris liable for the acts of William Ragsdale, Judah must first establish the existence of an agency relationship,[5] and then demon-

---

**2.** Anthony Fuller, one of the men with the dogs, pleaded guilty to a charge of assault with a dangerous weapon in connection with this incident. *United States v. Fuller*, D.C.Super. Ct. No. 96–CF–1919.

**3.** Ms. Judah was hospitalized for four days following the attack, missed several weeks of school, and had to get multiple rabies shots.

**4.** The court gave several additional reasons for entering summary judgment in favor of appellees, but our holding on the *respondeat superior* issue makes it unnecessary for us to address any of these alternative grounds.

**5.** Various labels have been used to describe this type of relationship, including principal-agent, master-servant, and employer-employee. For the purposes of this appeal, these terms are indistinguishable. The question is simply whether, under the doctrine of *respondeat superior*, the principal/master/employer should be held vicariously liable for the acts or omissions of the agent/servant/employee. Whichever label is used, our analysis remains the same. *See, e.g., District of Columbia v. Hampton*, 666 A.2d 30 (D.C.1995) (using the terms principal-agent and master-servant interchangeably).

strate that William Ragsdale acted within the scope of that relationship when he ordered the girls to leave the lobby of the apartment building. *See, e.g., Giles v. Shell Oil Corp.,* 487 A.2d 610, 611 (D.C. 1985). "Generally an agency relationship results when one person authorizes another to act on his behalf subject to his control, and the other consents to do so." *Smith v. Jenkins,* 452 A.2d 333, 335 (D.C. 1982) (citations omitted); *accord, e.g., Henderson v. Charles E. Smith Management, Inc.,* 567 A.2d 59, 62 (D.C.1989) (emphasizing consent and control).

■ Whether an agency relationship exists in a given situation depends on the particular facts of each case. *District of Columbia v. Hampton,* 666 A.2d 30, 38 (D.C.1995). The factors to be considered include "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer." *LeGrand v. Insurance Co. of North America,* 241 A.2d 734, 735 (D.C.1968), cited in *Hampton,* 666 A.2d at 38; *accord, Giles,* 487 A.2d at 611; *Safeway Stores, Inc. v. Kelly,* 448 A.2d 856, 860 (D.C.1982). Of these factors, the determinative one is usually "whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done." *LeGrand,* 241 A.2d at 735 (citation omitted); *accord, Hampton,* 666 A.2d at 38–39; *Levy v. Currier,* 587 A.2d 205, 209 n. 10 (D.C.1991); *Safeway,* 448 A.2d at 860; 53 AM. JUR. 2D *Master and Servant* § 2 (1970). The cases emphasize that the right to control, rather than its actual exercise, is usually dispositive of whether there is an agency relationship. *See, e.g., Safeway,* 448 A.2d at 860.

■ In deciding this question, courts will look both to the terms of any contract that may exist and to the actual course of dealings between the parties. *See Giles,*

487 A.2d at 613 ("the parties' actual relationship, in spite of contractual language, may be the conclusive factor"). "Conduct or words by a person which cause the other reasonably to believe that that person desires him to act on his account and subject to his control are sufficient to establish such authority." *Smith,* 452 A.2d at 335 (citing RESTATEMENT (SECOND) OF AGENCY § 26 (1957)).

■ In this case, the burden of establishing the existence of an agency relationship fell upon appellant Judah. *Henderson,* 567 A.2d at 62; *Smith,* 452 A.2d at 335. To prevail on their summary judgment motion, however, appellees had the burden of demonstrating the absence of any material issues of fact regarding that relationship. *See, e.g., Ferguson v. District of Columbia,* 629 A.2d 15, 19 (D.C. 1993); *Burch v. Amsterdam Corp.,* 366 A.2d 1079, 1084 (D.C.1976). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact ...." Super. Ct. Civ. R. 56(c). That test is met here.

We agree with the trial court that the evidence was insufficient to support a finding that appellees Reiner and Morris even knew of, let alone consented to, William Ragsdale's acting as resident manager for the apartment building. At most, the evidence offered in support of the summary judgment motion showed that Morris regularly hired William Ragsdale as an independent contractor to perform various repair and cleaning jobs at five of the properties it managed. It was undisputed that Reiner entered into a contract with Morris Management to manage certain properties that he owned. Morris, in turn, hired Wallace Ragsdale, William's father, to be the resident manager for the building at 1428 Euclid Street.[6] The

---

6. Reiner asserted that he was not involved in the selection of Wallace Ragsdale as resident

manager, and that he provided no guidance or supervision with respect to the work per-

terms of the agreement between Morris Management and Wallace Ragsdale were as follows:

AGREEMENT

Effective today, October 17, 1986, Wallace Ragsdale agrees to be resident manager of 1428 Euclid Street, N.W., Washington, D.C.

For his services he will receive a "rent free" apartment (quarters).

As resident manager, Mr. Ragsdale agrees to the following duties:

—Cleaning halls on a regular basis

—General upkeep of building

—Showing vacant apartments

—Grounds (grass care, mowing, removal of leaves, snow removal, etc.)

—Making sure trash is contained in proper receptacles

—Cleaning of apartment when it becomes vacant

—Maintaining laundry room (including notification to servicing company when machines break down)

In addition, Mr. Ragsdale will receive every two weeks $250 for cleaning as an independent cleaning contractor. He will be issued a "1099" each year for this service.

It was established by affidavits that at least two years before the incident in question, Wallace Ragsdale had ceased to reside in the apartment at 1428 Euclid; instead, the apartment was occupied by his two sons, William and José. There was some evidence that William and José represented to the tenants of the building that they were the resident managers. Pete Peterson, a resident of the building for more than thirty years, stated in a deposition that "the older gentleman who, at one time, acted as the resident manager has not lived on the premises" for at least two years, but William and José live on the first floor and "represent that they are the resident managers when their father is not

there." David Tollar, another longtime resident, said that he had heard William and José tell people "numerous" times that they were the managers of the building. He stated that "on many occasions," when he contacted Jerry Morris, president of Morris Management, about repairs to his apartment, he was told to "go see the boys." Frances Beeks, also a resident, testified that she too had overheard the sons claim to be the managers of the building, that the sons performed repairs there, and that she understood that "Mr. Ragsdale and his two sons share responsibility for the building."

■ The fact that William and José may have held themselves out to tenants and others as resident managers, however, is not enough to impose *respondeat superior* liability on Reiner and Morris. In order to demonstrate the existence of an agency relationship, Judah must also show that Reiner and Morris knew of, and consented to, those representations. The evidence presented to the court provides no support for such a finding.

In his deposition testimony, Jerry Morris stated that William and José only did occasional work on a contractual basis, and that he would be "surprised" if they introduced themselves as resident managers. There was substantial evidence to support Mr. Morris' understanding of the relationship between his company and William Ragsdale. For example, the record contains six receipts for services such as cleaning, painting, and minor repair work that William provided to Morris Management. In a Form 1099 (independent contractor's tax return) filed in 1996, William Ragsdale reported $930.00 in non-employee compensation from Morris Management.

At most, this evidence established that Morris Management had an ongoing business relationship with William Ragsdale, whom it hired from time to time as an independent contractor to perform various

formed by either Morris Management or the resident manager.

jobs at 1428 Euclid Street and elsewhere. None of the evidence relied on by Judah could demonstrate that Morris had any knowledge that William and José held themselves out as managers of the apartment building. Even when the evidence is viewed in the light most favorable to Ms. Judah as the non-moving party, the only proof of Morris' alleged awareness of this fact was (1) evidence that Morris might have known that William resided at 1428 Euclid in the apartment which had been made available to Wallace Ragsdale as partial compensation for his services as resident manager,[7] and (2) evidence that Morris told tenants of 1428 Euclid to "go see the boys," meaning William and José, when their apartments were in need of repairs. It is not surprising that when the tenants contacted Mr. Morris on these occasions, he referred them to someone who lived in their building and thus would be able to provide the needed services expeditiously. But that fact falls far short of establishing that William was anything more than an independent contractor hired by Morris to perform occasional repair work.

Furthermore, the fact that William and José were living in the apartment provided for their father shows only that Wallace Ragsdale chose to give part of the compensation he received for his employment as resident manager to his two sons. Such an arrangement is hardly unusual. Thus, even if Morris knew that William and José lived in Wallace's apartment, it does not necessarily follow that Morris also knew they were holding themselves out as resident managers. There is no evidence that

the apartment served as partial compensation for the repair work performed by William, or that Wallace received any additional compensation as a substitute for the apartment after he moved out.

In sum, the information available to Morris was simply not sufficient to put it on notice that William Ragsdale was holding himself out as the resident manager of the apartment building at 1428 Euclid. Without showing, at a minimum, that Morris was aware of this fact, Judah had no way of proving that Morris also consented to the arrangement, and thus no way of establishing the existence of an agency relationship between William Ragsdale and the appellees.

### B. The Merits of Judah's Underlying Tort Claims

The theories of liability advanced by Judah, though novel, may not be entirely devoid of merit.[8] However, because William Ragsdale has never been made a party to this lawsuit, our disposition of the *respondeat superior* issue makes it unnecessary for us to address the trial court's alternative bases for its rulings.

In her original complaint, Judah identified the man who evicted her as "John Doe." During discovery it was learned that José and William Ragsdale lived in the apartment provided to Wallace Ragsdale as partial compensation for his services as resident manager. Given this new information, Judah amended her complaint to substitute José Ragsdale for John Doe as the third defendant. It soon became apparent, however, that William, rather than José, was responsible for evicting Judah

7. In addition to the fact that Morris instructed tenants of 1428 Euclid to "go see the boys" when they needed repairs, William listed his address as 1428 Euclid Street, N.W., Apartment 106, on both the tax document and the work receipts.

8. For example, the trial court's ruling that the men with dogs could not be the source of harm in a claim against the resident manager is contrary to the view of the Restatement, which takes the position that liability may be imposed in such circumstances so long as the actor is aware that harmful contact with a third person will result. *See* RESTATEMENT (SECOND) OF TORTS § 25 (1965). It is not essential that the plaintiff be put in apprehension of a contact inflicted by the actor. Rather, there may be liability if "the apprehension is aroused that a third person is about to inflict the contact, or even that it is about to be inflicted by some force of nature." *Id.*, comment a.

and Dews from the lobby of the building; in fact, the undisputed evidence established that José was not even in the building on the date in question and played no role in the incident.[9] Although Judah was well aware of this fact, as shown by her repeated references to William Ragsdale as the man who evicted her in all of her subsequent pleadings and throughout this appeal, she failed to amend her complaint to substitute William for José.[10] William Ragsdale was never named as a defendant in the action, nor was he identified as a party to this appeal.

Thus the only theory upon which Judah can proceed here is that Reiner and Morris are vicariously liable for the acts of William Ragsdale. She has no outstanding claims against William Ragsdale in his individual capacity. Consequently, even if we were to find some or all of the trial court's alternative grounds for rejecting Judah's tort claims erroneous, our holding that Reiner and Morris are not liable for the acts of William Ragsdale would require us to affirm the trial court's decision.

### III

There was no evidence before the trial court which would support a finding that William Ragsdale acted as the employee or agent of appellees Reiner and Morris. Without evidence of such a relationship, Judah cannot prevail on any of her claims. We therefore affirm the trial court's grant of summary judgment on counts one and four of the complaint. We further hold that our resolution of this question necessarily disposes of the assault and battery claims contained in counts two and three as well. Although the trial court dismissed those counts for failure to state a claim upon which the alleged resident manager could be found liable, we affirm on the alternative ground that summary judgment in favor of appellees Reiner and

Morris was required because of the total lack of proof of an agency relationship.

*Affirmed.*

---

9. The trial court dismissed Judah's claims against José Ragsdale because there was no allegation that he was even present during the events at issue.

10. In her brief, Judah admits that she mistakenly named José instead of William Ragsdale.