*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-AA-985

UNITED HOUSE OF PRAYER FOR ALL PEOPLE, PETITIONER,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF TRANSPORTATION, RESPONDENT.

Appeal from the Office of
Administrative Hearings
(DDOT-U100262-19)

(Hon. Robert E. Sharkey, Administrative Law Judge)

(Submitted October 6, 2020                    Decided November 17, 2022)

*Mickie Bailey* was on the brief for petitioner.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General (at the time of submission), *Caroline S. Van Zile*, Principal Deputy Solicitor General (at the time of submission), *Graham E. Phillips*, Assistant Attorney General, were on the brief for respondent.

Before BLACKBURNE-RIGSBY, *Chief Judge*, GLICKMAN, *Associate Judge*, and WASHINGTON, *Senior Judge*.

BLACKBURNE-RIGSBY, *Chief Judge*: Petitioner United House of Prayer for All People ("UHP") received a Notice of Infraction from the District of Columbia Department of Transportation ("DDOT") assessing a fine of $60,450 for the

unlawful topping[1] of three callery pear, Bradford cultivar trees located on UHP's property without a permit. UHP did not top the trees directly, but rather the trees were topped by Romero Ventures, Inc., ("Romero"), an independent contractor with whom UHP contracted for landscaping services, through a subcontractor. UHP unsuccessfully challenged the Notice of Infraction before an Administrative Law Judge ("ALJ") with the Office of Administrative Hearings ("OAH"), who found UHP vicariously liable for topping the trees, either by expressly or impliedly authorizing Romero to top the trees or, alternatively, ratifying Romero's actions after the work was performed.

In this appeal, UHP disputes the factual finding of the OAH that there was an agency relationship between UHP and Romero. Additionally, while UHP concedes that there was pruning work performed by Romero without a permit, it disputes the OAH's conclusion that the pruning work at issue qualifies as "topping" in violation of D.C. Code § 8–651.04 and 24 D.C.M.R. 3700.1. UHP also asserts the following arguments: (1) OAH misinterpreted the statutory and regulatory provisions in light of the definition of topping; (2) OAH's failure to join Romero was erroneous; (3)

---

[1] To "top" means, "as defined by the latest edition of the ANSI-A300 pruning standards, the unacceptable act of tree pruning resulting in the indiscriminate reduction of the tree's crown leading to disfigurement or death of the tree." D.C. Code § 8-651.02(6).

assuming *arguendo* that Romero was an agent of UHP, UHP is not vicariously liable for the actions taken by Romero's sub-contractor in topping the trees because the work performed was outside of the scope of the agency agreement; and (4) UHP's payment of Romero was not a ratification which created an agency relationship between UHP and Romero.

We conclude that OAH erred in determining that there was substantial evidence supporting a finding that there was a principal-agent relationship between UHP and Romero, or that UHP otherwise ratified Romero's actions. We further conclude that the OAH erred as a matter of law in concluding that UHP was vicariously liable for Romero's actions. Accordingly, we reverse. Because of our reversal on this question, we do not address the other issues raised by the parties, including whether DDOT's decision to proceed against UHP before the OAH was proper, whether the ALJ's denial of joinder was proper, and whether the trees were topped within the meaning of the statute and corresponding regulations.

## I.     Factual and Procedural Background

UHP is the owner of the multi-unit apartment building located at 1117 McCollough Street, NW Washington, D.C. ("the property"). On the property there

are three callery pear, Bradford cultivar trees ("the trees"), which are deemed "Special Trees" pursuant to D.C. Code Sec. 8-651.02(5) because they have a "circumference between 44 inches and 100 inches." *See also* 24 D.C.M.R. § 3799.1(c) (defining a Special Tree as "a tree within the District of Columbia that has a minimum circumference of fifty-five inches (55 in.)."). The trees, which are the focus of this appeal, are located between the sidewalk and the apartment building. UHP does not perform any of the landscaping on the property; instead, it has always engaged the services of independent contractors to landscape its D.C. properties. UHP maintains that it "is not in the business of performing landscaping functions, but rather is an organization of churches whose founding purpose is to perpetuate its doctrine of Christianity."

In order to provide for landscaping and maintenance services at the property in question at 1117 McCollough Street, NW, UHP entered into the "Independent Contractor Agreement" (the "Agreement") with Romero on May 3, 2010. The Agreement provides that "[t]he performance of work under this Agreement may be governed by 1) a Statement of Work, if applicable; or 2) oral instructions from a supervisor or other representative(s) designated by [UHP]." The Agreement further provides that "[UHP] may from time to time make changes in the scope of services set forth in a Statement of Work, if applicable, or in any oral instructions from a

supervisor or other representative(s) designated by [UHP]." Under the terms of the Agreement,

> [t]he parties to this Agreement recognize that this Agreement does not create any apparent agency relationship . . . between the parties. [Romero] shall have the right to determine the method, details, and means of performing the services. [UHP] shall, however, be entitled to exercise general powers of supervision and control over the results of the services performed by [Romero] to assure satisfactory performance, including the right to inspect, the right to make suggestions or recommendations as to the details of the services, and the right to propose modifications to the services.

Although the Agreement does not expressly address Romero's ability to sub-contract out work, the Agreement implicitly acknowledges that Romero may retain sub-contractors by requiring that "[Romero] shall also carry workmen's compensation coverage in the amounts required by law on . . . any sub-contractor," however, "[Romero] shall not enter into agreements of any kind on behalf of [UHP] and shall have no power or authority to bind or obligate [UHP] in any manner to any third party."

Thereafter, UHP and Romero entered into the "Annual Landscape Maintenance Program," (the "Program") in August 2011, which all parties agree was the governing Statement of Work at the time the pertinent Notice of Infraction was issued. The Program provides that April through October, "[a]ll ornamental shrubs,

bushes, and evergreens will be pruned or sheared as needed in order to ensure a professionally maintained appearance. This includes tree suckers, shoot growth, and tree limbs impeding walkways and parking areas (up to 14' high)."

On October 3, 2018, Matthew Lehtonen, an Urban Forester for the District of Columbia Department of Transportation, observed the three callery pear, Bradford cultivar trees in passing and did not notice any damage to the trees or hazardous conditions posed to the public.

On November 15, 2018, a snowstorm resulted in the trees having several broken and hanging limbs. Consequently, UHP, through its Administrative Assistant, Robert Price, notified Romero, of the damage to the trees. Mr. Price asked Romero to "look around" the property to survey any damage. Mr. Price testified:

> I just reached out and let [Romero] know that . . . because of the storm that we had, [they] might want to look around because I see some things hanging that don't look too good. That was pretty much it. I don't [] direct them or anything. But if I see something that kind of looks a little, I'm not an expert. But if I see a tree hanging and cars hitting it that can't be good.

Without consulting UHP, Romero sub-contracted Y.A. Landscaping Services ("YALS") to prune and trim the trees, which was completed on or about November 20, 2018. Mr. Price further testified that from his observation Romero "cut the top,

they topped the tree," although he denied responsibility for having directed Romero to do so. Although he attributed the work to Romero, Mr. Price clarified that he subsequently learned that it was not Romero who topped the trees, but another independent contractor hired by Romero (i.e., a sub-contractor). In the OAH's October 2, 2019 order, it found that "the [maintenance] contract did not cover or include the pruning or trimming of trees." Yet, the OAH noted that "Romero apparently took this oblique instruction to mean that [Romero] had complete discretion to do whatever [Romero] decided to do regarding the pruning of the trees."

On November 20, 2018, Mr. Lehtonen observed that the trees on the property had undergone "pruning that resulted in indiscriminate reduction of the trees' crowns[] with intermodal cuts, [and the removal of] more than 75% of the foliage of each tree." Mr. Lehtonen admittedly did not observe the trees in the aftermath of the snowstorm, but did testify before the OAH that based on his prior observation of the trees approximately six weeks prior to the snowstorm, the trees were not hazardous or damaged. Therefore, he concluded that by November 20, 2018, the trees had been topped.

On December 20, 2018, DDOT served UHP with a Notice of Infraction for the unlawful topping of three protected special trees without a permit, and imposed

a fine of $60,450, pursuant to the calculation of fines set forth under D.C. Code § 8-651.04(d).[2] DDOT served UHP as the property owner, rather than Romero or its subcontractor YALS, as the entity that performed the work, based on its asserted general practice of serving the notice of violation against the property owner. It is undisputed UHP did not pursue a "Special Tree Removal Permit" prior to the topping of the three trees, nor did UHP seek a permit within fifteen days after the trees were topped on the basis that topping was necessary to avoid imminent harm or danger to person or property because the trees were now "Hazardous Trees," in accordance with 24 D.C.M.R. § 3700.2. Had UHP successfully obtained a permit under either provision of 24 D.C.M.R. § 3700, there would have been no basis for DDOT to issue a Notice of Infraction and assess a fine thereto.

On January 3, 2019, after UHP received the Notice of Infraction from DDOT, Romero billed UHP $1,890 for pruning "3 Pear trees along L street," which UHP subsequently paid. Shortly thereafter, UHP filed an answer to DDOT's Notice of Infraction with a plea of "deny" and requested a hearing with the OAH.

---

[2] "A violation of subsection (a) of this section, or a failure to comply with the conditions contained in a Special Tree removal permit, shall constitute a violation subject to a fine of not less than $300 per each inch of the circumference of the Special Tree in question." D.C. Code § 8-651.04(d). DDOT "took the cumulative circumference of the trees, multiplied that by 300 and . . . arrived at the $60,450.00 fine."

UHP then filed a motion with the OAH seeking to join Romero as a third-party respondent. UHP claimed indemnification, or contribution in the alternative, with respect to Romero's actions and the alleged violation. The OAH denied UHP's motion to join Romero, explaining that the jurisdiction of the OAH is limited to the case brought by DDOT, and that the ALJ may not require DDOT to proceed against a specific party (i.e., Romero).

At the hearing before the ALJ, Matthew Lehtonen, the urban forester employed by DDOT who issued the Notice of Infraction, testified on behalf of DDOT. UHP introduced the testimony of Robert Price, the property manager for the property at 1117 McCollough Court who interacted with Romero, and expert Keith Pitchford, a certified arborist in tree assessment and risk. UHP denied the alleged violation, for which DDOT had the burden of proving: (1) the infraction occurred and (2) UHP was responsible for it. The OAH found that the parties did not dispute whether the trees were topped without a permit. However, the OAH noted that UHP disputed its responsibility for the alleged violation because it contended it could not be held liable for the permitless pruning completed by Romero through YALS.

Citing internal OAH precedent, the OAH stated that "the [s]tatute does not affix strict liability, [that is] liability without fault, on the person who owns the property where the trees are located." But, the OAH concluded, based on general agency principles, that "[t]he owner of the property who directs or authorizes the removal or topping of a Special Tree in violation of the Statute can also be held primarily liable" including by "ratifying the illegal acts of its agents." The OAH held DDOT proved by a preponderance of the evidence that UHP violated the statute (i.e., that the trees on UHP's property were topped without a permit) by authorizing Romero to top the special trees without a permit, and by ratifying the acts of its agents. The OAH concluded that UHP impliedly authorized Romero to top the trees by Mr. Price's statement to "look around" the property on November 15, 2018, and its extensive history of doing business with Romero under contract. The OAH concluded that Mr. Price had the authority to engage with Romero on behalf of UHP because that was within the scope of Mr. Price's duties. Furthermore, the OAH concluded that UHP ratified Romero's act of hiring subcontractor YALS to top the trees by paying Romero for the work. The OAH did not explain how it weighed Mr. Price's testimony that he did not "direct" Romero's conduct in reaching its conclusion. UHP timely petitioned for review.

## II.    Discussion

The OAH found UHP liable on a theory of vicarious liability, *respondeat superior*, based on agency principles.[3]  The OAH turned to agency principles, rather than looking at the agreement between UHP and Romero because the OAH found that their agreement "did not cover or include the pruning or trimming of trees."  As such, the OAH specifically held that DDOT proved by a preponderance of the evidence that UHP violated the statute — i.e., that the trees on UHP's property were topped without a permit — by impliedly authorizing Romero to top the special trees and by ratifying the topping.  It found that UHP impliedly authorized Romero to top the trees by its statement to "look around" the property on November 15, 2018, and its extensive history of doing business with Romero under the contract.  Furthermore, it found that UHP ratified Romero's act of hiring subcontractor YALS to top the trees by paying Romero for the work.

---

[3] In this context, it makes no difference whether we speak of a principal-agent relationship or a master-servant relationship. *See, e.g., Convit v. Wilson*, 980 A.2d 1104, 1114 n.14 (D.C. 2009) ("We have used different terms interchangeably to describe the agency relationship that exists under the doctrine of respondeat superior, 'including principal-agent, master-servant, and employer-employee.' *Judah v. Reiner*, 744 A.2d 1037, 1040 n.5 (D.C. 2000).").

We affirm an OAH order when "(1) OAH made findings of fact on each materially contested issue of fact; (2) substantial evidence supports each finding; (3) OAH's conclusions of law flow rationally from its findings of fact; and (4) OAH's legal conclusions are not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *D.C. Dep't of the Env't v. E. Capitol Exxon*, 64 A.3d 878, 880 (D.C. 2013) (citing *Berkley v. D.C. Transit, Inc.*, 950 A.2d 749, 759 (D.C. 2008)) (cleaned up). "The existence of an agency relationship is a question of fact." *Henderson v. Charles E. Smith Mgm't, Inc.*, 567 A.2d 59, 62 (D.C. 1989). "[T]o determine whether a principal-agent relationship has been created, the court must analyze the relationship between the parties in its entirety and determine if two factors exist. First, the court must look for evidence of the parties' *consent* to establish a principal-agent relationship. Second, the court must look for evidence that the activities of the agent are subject to the principal's *control*." *Id.* (emphasis in original). "[T]he parties' actual relationship, in spite of contractual language, may be the conclusive factor." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985). "We defer to the OAH's findings of fact if they are supported by 'substantial evidence,' [such that] a reasonable mind might accept [such relevant evidence] as adequate to support a conclusion." *E. Capitol Exxon*, 64 A.3d at 880. We assume, without deciding, for purposes of this analysis, that the trees were topped within the meaning of the relevant statute and regulations.

Before reaching the question of agency, we must determine whether the OAH's finding that the agreement between UHP and Romero excluded the pruning or trimming of the trees was supported by substantial evidence. We conclude that it was. The relevant provision of the Program governing pruning provides that from April to October, "[a]ll ornamental shrubs, bushes, and evergreens will be pruned or sheared as needed in order to ensure a professionally maintained appearance. This includes tree suckers, shoot growth, and tree limbs impeding walkways and parking areas (up to 14' high)." Here, the work was performed in November, and thus it was necessarily outside the scope of the Program. Likewise, although not directly testified to during the hearing before the OAH, the images of the trees admitted into the record reflect that the trees exceeded 14' in height, further placing the work outside the scope of the Program. Accordingly, the record reflects substantial evidence to support the OAH's finding that the work, and the resulting liability, was outside the scope of the Program. Thus, we turn to considering whether agency principles provide a basis for imputing liability onto UHP.

The OAH did not set forth its reasoning for concluding that there was a principal-agent relationship between UHP and Romero. Indeed, the OAH merely stated that "it is reasonable to conclude from the evidence that Romero was impliedly

authorized by Mr. Price, acting within the scope of his duties for [UHP], to do the pruning work in any manner determined by Romero in its discretion." DDOT concedes as much, stating that "[t]he ALJ's factual findings are clearly set forth in the final order . . . and nowhere is there a finding that a master-servant agency relationship existed between [UHP] and Romero."[4]

On review of the record before us, no substantial evidence exists to support a finding that a principal-agent relationship existed between UHP and Romero. As a part of this analysis, we must consider whether Romero was in fact an independent contractor and not an agent of UHP. "An independent contractor is defined as 'a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.'" *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860 n.8 (D.C. 1982) (quoting RESTATEMENT (SECOND) OF AGENCY § 2(3) (1958)). A true independent contractor is not considered to be an agent of the hirer during the performance of the work for which they were hired and, as such, "a company is not liable for the acts of its independent contractors." *Whitt v. Am. Prop.*

---

[4] Consistent with this position, DDOT argues the operative act to impute liability onto UHP is UHP's subsequent ratification of the pruning, even absent a prior principal-agent relationship.

*Constr., P.C.*, 157 A.3d 196, 207-08 (D.C. 2017) (quoting *Anthony v. Okie Dokie, Inc.*, 976 A.2d 901, 906 (D.C. 2009) (footnote excluded). This is sometimes referred to as the "independent contractor doctrine." *See, e.g., Shapiro v. Vautier*, 36 A.2d 349, 350 (D.C. 1944). Here, the Agreement between the parties is styled as an "Independent Contractor Agreement," and thus a prima facie case has been established that Romero was an independent contractor for whose actions UHP cannot be held liable. However, there may still be a principal-agent relationship between UHP and Romero if they consented to establish such a relationship or their conduct establishes that such a relationship actually or impliedly exists. *See generally Henderson*, 567 A.2d at 62.

Looking first "for evidence of the parties' *consent* to establish a principal-agent relationship," *Henderson*, 567 A.2d at 62, we turn to the language of the Agreement between UHP and Romero. Under the Agreement, the parties expressly disavowed an intention to create a principal-agent relationship in stating that "[t]he parties to this Agreement recognize that this Agreement does not create any apparent agency relationship . . . between the parties."

Nor are we persuaded that the actual relationship between UHP and Romero evidences that "the activities of the agent are subject to the principal's *control*." *Id.* at 62 (emphasis in original). The factors we are to consider in determining the actual relationship between the parties are as follows:

> (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer. Standing alone, none of these *indicia*, excepting (4), seem controlling in the determination as to whether such relationship exists. The decisive test . . . is whether the employer has the *right to control and direct the servant in the performance of his work and the manner in which the work is to be done*.

*Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860 (D.C. 1982) (emphasis in original) (internal citations omitted). *Safeway Stores* further explains that, "[i]n characterizing the right to control as the determinative factor, we mean the right to control an employee in the performance of a task and in its result, and not the actual exercise of control or supervision." *Id.* Looking at the relationship between UHP and Romero through this lens, a review of these factors counsels against finding an agency relationship.

The selection and engagement of Romero by UHP weighs against finding an agency relationship. The initial engagement as testified to by Mr. Price does not resemble the manner in which an employer hires an employee. Instead, the parties' agreement to enter into an independent contractor relationship bears out. UHP does not have any selection in determining who Romero brings on as an employee or sub-contractor, nor does UHP direct which of Romero's employees or sub-contractors performs work on the UHP properties, including the property at issue here. *Cf. Safeway Stores*, 448 A.2d at 860.

The method that UHP paid Romero for its services also weighs against finding an agency relationship. Romero was paid monthly, based on the terms of the "Annual Landscape Maintenance Program," with separate billing for spring cleaning or optional services. This is unlike how an employee would expect to be paid. *Cf. Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 424 (D.C. 2006) (finding that a jury could conclude that payment twice a month is common in an employee-employer relationship).

UHP's power to discharge Romero also weighs against finding an agency relationship. Unlike an employer-employee relationship, the Agreement does not

provide for the terms of dismissal for cause or without cause. It also does not contemplate common employer-employee disciplinary concepts antecedent to termination such as probation or suspension. *See id.* Instead, the Agreement provides UHP with the sole authority to terminate, so long as UHP provides no less than ten days' written notice and UHP pays for services rendered. The Program provides comparable authority to terminate the Program on seven days' notice prior to the end of the month and payment of any invoice and balance.

Whether UHP had the power to control Romero's conduct is a narrower question, although we conclude it weighs against finding an agency relationship. We start with the language of the Agreement between the parties. In relevant part, the Agreement provides that "[Romero] shall have the right to determine the method, details, and means of performing the services." It also provides that "[UHP] shall, however, be entitled to exercise general powers of supervision and control . . . to assure satisfactory performance, including the right to inspect, the right to make suggestions or recommendations as to the details of the services, and the right to propose modifications to the services." Although this language suggests that UHP had some right to control or supervise Romero's work, we have held that "the right to inspect and the right to set standards by which [duties are performed] are not indicia of control." *District of Columbia v. Hampton*, 666 A.2d 30, 40 (D.C. 1995)

(quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985)) (internal citations and quotations omitted). What is more relevant is the right to control the day-to-day operation or performance. *Id.*; *Giles*, 487 A.2d at 613. Here, the contractual language does not purport to provide UHP with that level of control; nevertheless, we look to the actual relationship of the parties to see whether control existed in spite of the contractual language. *See Hampton*, 666 A.2d at 40.

Looking through the language of the contract to the actual relationship between the parties leads us to the same conclusion. During Mr. Price's testimony before the OAH, he testified, for example, that UHP "can recommend" that Romero perform certain work, but that "it's still up to them whether or not they want to do it or not. [They are not obligated to comply with a request] because they are the contractor that we hired and we trust their decision making." He also testified that he does not "direct" Romero in the performance of its work. This testimony, which was undisputed, compels us to conclude that UHP did not exercise the level of day-to-day control comparable to that of an employer-employee relationship.

Additionally, as Mr. Price testified, it is undisputed that UHP is not in the business of performing landscaping functions as "an organization of churches whose

founding purpose is to perpetuate its doctrine of Christianity." This factor also weighs against finding an employer-employee relationship.

In considering the five *Safeway Stores* factors, we conclude that no actual agency relationship existed between UHP and Romero. The OAH nevertheless found that the communication between Mr. Price on behalf of UHP with Romero was sufficient to create an implied agency relationship, given the Agreement expressly contemplates that "[t]he performance of work under this Agreement may be governed by . . . oral instructions from a supervisor or other representative(s) designated by [UHP]" and "[UHP] may from time to time make changes in the scope of services set forth . . . in any oral instructions form a supervisor or other representative(s) designated by [UHP]." *See FDS Rest., Inc. v. All Plumbing, Inc.*, 241 A.3d 222, 237 (D.C. 2020) ("An agency relationship . . . may be created through actual authority (either express or implied), apparent authority, or ratification.") (citing RESTATEMENT (THIRD) OF AGENCY §§ 2.01-4.08 (Am. Law Inst. 2006)). The OAH based this conclusion on the testimony of Mr. Price that, as a corporate administrative assistant for UHP, part of his responsibilities include communicating with Romero on behalf of UHP, and UHP did not, and does not now, argue that Price lacked the authority to communicate with Romero as he did given his history of communicating with Romero as a part of his responsibilities. Mr. Price's testimony

was clear that he did not intend to "direct" Romero's response to the concerns he raised with the trees.  Given the lack of evidence that Romero felt it was compelled to act consistent with Mr. Price's request (i.e., that it was subject to UHP's control), there is no substantial evidence in the record supporting the ALJ's finding that Romero understood it was required to act within the scope of its agreement with UHP and from which the ALJ could conclude that a principal-agent relationship existed between UHP and Romero.  Accordingly, we further conclude that Romero was, in fact, an independent contractor.

DDOT argues, nevertheless, that the existence of an agency relationship between UHP and Romero is "irrelevant" because it "ratified" or otherwise separately contracted for the "topping" of the trees.  The OAH found that UHP subsequently ratified the tree topping when UHP paid Romero's invoice without objection in January of 2019, which was after the Notice of Infraction had issued. *See* RESTATEMENT (THIRD) OF AGENCY: RATIFICATION DEFINED § 4.01(1-2) ("Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.  A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents."); *see also* RESTATEMENT (THIRD) OF AGENCY: RATIFICATION DEFINED § 4.01 cmt. d ("To

constitute ratification, the consent need not be communicated to the third party or the agent.”); *see also Lewis v. Washington Metropolitan Area Transit Authority*, 463 A.2d 666, 672 (D.C. 1983) (stating that a principal who has ratified an agent’s actions is bound *nunc pro tunc* to the date of the agent’s actions).

UHP does not dispute that it paid Romero, but contends that ratification requires the prior existence of a principal-agent relationship. Thus, UHP argues, because there was no agency relationship, the payment did not operate as a ratification. We need not definitively resolve the question of whether, in this jurisdiction, a prior agency relationship is necessary for ratification[5] because, even assuming it is not necessary, DDOT failed to demonstrate that there was a ratification. While it is true that payment is often a form of ratification, the mere fact of payment, without more, is insufficient to constitute manifestation of assent to be bound by Romero’s prior acts. Indeed, the record fails to reflect evidence that UHP intended for this payment to affect its legal relations with Romero or to be bound by the act’s legal consequences. *See* RESTATEMENT (THIRD) OF AGENCY:

---

[5] This appears to be a question of first impression in this jurisdiction, and not one in which there is uniformity across all jurisdictions. *See generally* RESTATEMENT (THIRD) OF AGENCY: RATIFICATION DEFINED § 4.01 cmt. b (“In most jurisdictions, ratification may create a relationship of agency when none existed between the actor and the ratifier at the time of the act.”).

RATIFICATION DEFINED § 4.01 cmt. d.  Although UHP was aware of the Notice of Infraction by that date, in transmitting payment to Romero, UHP did not, for example, agree to abandon its argument that Romero was the actual party responsible for the topping, as evidenced by the later-in-time Motion for Leave to Join Romero Ventures LLC as a Third-Party Respondent.  Nor can manifestation of assent to be bound be inferred by UHP "accepting the benefit" of Romero's actions, which were completed and irreversible by the time UHP received the invoice from Romero.  Such conduct is explainable, for example, by UHP wanting to maintain its working relationship with Romero as Romero continued to service its properties. *Id.*; *see also Dart Drug, Inc. v. Linthicum*, 300 A.2d 442, 444 (D.C. 1973).  As such, we conclude that UHP did not ratify Romero's actions.  We also disagree with DDOT that the conduct at issue here warrants applying an exception to the general rule that one who engages an independent contractor is not liable for its actions.[6]

---

[6] *See, e.g., Fry v. Diamond Constr.*, 659 A.2d 241 (D.C. 1995) (finding an exception for one who directs an independent contractor to perform dangerous work or work in a dangerous manner); *Shapiro v. Vautier*, 36 A.2d 349, 350 (D.C. 1944) (finding an exception for conduct that "itself amounts to a nuisance or necessarily operates to injure or destroy the property of [another]"); *Taylor v. Tellez*, 610 A.2d 252, 254-55 (D.C. 1992) (finding an exception for conduct that constitutes an intentional tort).

Finally, for the reasons set forth *supra* explaining why Mr. Price's statement to Romero to "look around" was insufficient to create an implied agency relationship, we find that his statements are also insufficient to have created an oral contract between UHP and Romero concerning the work performed on the three trees. Moreover, there is insufficient evidence in the record to establish there was a meeting of the minds between UHP and Romero on this issue sufficient to establish an oral contract. Accordingly, we also find that this is not a basis for holding UHP vicariously liable.

### III.   Conclusion

In summary, we conclude that, even if the three callery pear trees located at the property were topped by Romero, liability would not be imputed onto UHP because: (1) there was no agency relationship between UHP and Romero, (2) UHP did not ratify Romero's actions in a manner sufficient to impute liability, and (3) there is not substantial evidence in the record to conclude that UHP reached a separate oral contract with Romero concerning the trees. Accordingly, we reverse and vacate the fine totaling $60,450.

*So ordered.*